CHOCK FULL O'NUTS CORPORATION,
Plaintiff–Appellant,

v.

TETLEY, INC., Defendant–Appellee.

Docket No. 97–9166.

United States Court of Appeals,
Second Circuit.

Argued April 9, 1998.

Decided Aug. 17, 1998.

Frederick P. Schaffer, New York, N.Y. (Bridget Calhoun, Schulte Roth & Zabel LLP, New York, N.Y., Of Counsel), for Plaintiff–Appellant.

David E. Brodsky, New York, N.Y. (Steven M. Knecht, Cleary, Gottlieb, Steen & Hamilton, New York, N.Y., Of Counsel), for Defendant–Appellee.

Before: WALKER and LEVAL, Circuit Judges, and BRIEANT, District Judge.*

Judge BRIEANT dissents by separate opinion.

LEVAL, Circuit Judge:

Plaintiff Chock Full O'Nuts Corporation ("Chock"), appeals from a judgment of the United States District Court for the Southern District of New York (Peter K. Leisure, *Judge*), dismissing Chock's complaint against defendant Tetley, Inc. Chock claimed it was entitled to payment for a shortfall in the funding of a pension plan covering a facility acquired by Chock from Tetley. The district court determined that the contract of

---

* The Honorable Charles L. Brieant, United States District Judge for the Southern District of New      York, sitting by designation.

sale was not susceptible of an interpretation under which Chock would be entitled to recover and therefore granted summary judgment in favor of Tetley. We affirm.

## BACKGROUND

From 1982 to 1989, Tetley owned and operated a plant to process and package instant coffee in Linden, New Jersey ("the Linden plant" or "the plant"). Tetley sold the coffee produced there nationwide, in part to "private label" customers. Apparently all the instant coffee sold by Tetley was produced at the plant. Chock operated a small instant coffee plant, in Queens, New York.

On November 7, 1989, Tetley entered into an agreement to sell its instant coffee business to Chock ("the contract" or "the agreement"). A recital clause of the contract defined the business as follows:

> [Tetley] is engaged in the business of processing and packaging in Linden, New Jersey and selling instant coffee (the "Business").

The contract provided that Chock pay Tetley a total of $8 million for, *inter alia:* (i) with some exceptions, "all of the assets and properties of every kind and description used in the Business," (ii) "all inventory of instant coffee (whether raw materials, work-in-process or finished goods) and packaging supplies, used in the Business"; and (iii) a covenant under which Tetley agreed not to compete with the business for a period of five years. In addition to the lease of the physical plant, the purchased assets included "all customer lists, production records and other records relating to the Business", "all intangible assets relating to the Business", and "the labor and collective bargaining agreement with respect to the Business...."

Pursuant to the contract, Chock assumed Tetley's liabilities under the collective bargaining agreement between Tetley and Local 478 of the International Brotherhood of Teamsters, including sponsorship of a union pension plan ("the pension plan" or "the plan"). As of mid–1989, the pension plan had an "Unfunded Actuarial Accrued Liability"— a shortfall between the plan's assets and its accrued liabilities—of approximately $1.5 million. As partial assurance against the possibility that Chock would be unable to operate the business profitably but would nonetheless incur a substantial pension liability, the parties agreed in the contract that:

> If within five (5) years of the Closing Date of the sale, [Chock] elects to close the Business and terminate the Plan, [Tetley] shall pay [Chock] ... an amount equal to the lesser of [the Unfunded Actuarial Accrued Liability as of September 1, 1989 or the date of the closing of the business].

Because the Closing Date was determined to be October 30, 1989, Chock could trigger Tetley's obligation to pay for any deficiency in the pension plan by "clos[ing] the Business and terminat[ing] the Plan" at any time before October 30, 1994.[1]

Beginning in November 1989, Chock operated the Linden plant and sold the instant coffee produced there ("Linden-produced coffee") to customers nationwide, including customers obtained from Tetley. Chock experienced high production costs at the plant. Thus, in early 1994 Chock executives informed Tetley that Chock intended to close the Linden plant within several months. Chock stated that it would continue selling instant coffee, which would be packed for Chock by a Mexican company.[2] Chock subsequently informed Tetley by letter dated June 23, 1994 that it would close the Linden plant by July 9, 1994 "at which time all production will cease and production personnel will be terminated" and that it would terminate the pension plan on or before October 8, 1994. By letter dated July 6, 1994, Chock informed Tetley that the plan trustees had voted, on July 1, to terminate the plan on or before October 8, 1994, and that, pursuant

---

1. In addition to the purchase/sale agreement, the parties also entered into a "packing agreement" under which Chock undertook to supply Tetley with instant coffee for at least three years.

2. On April 19, 1994, Chock entered into a contract with a Mexican company, Industrias Marino S.A. de C.V., under which Chock agreed to purchase instant coffee processed and packaged at Marino's plant in Mexico.

to the contract, Tetley would be liable for a plan deficiency of some $1.6 million.

Chock permanently ceased operations at the Linden plant in July and terminated the plan on September 30. After the expiration of the five-year period, however, Chock made liquidating sales of inventory produced at the Linden plant. In addition, Chock continued to sell instant coffee produced by its Mexican source to customers it had obtained from Tetley in the purchase of the plant. Tetley refused to pay for the pension deficiency, arguing that its obligation to do so had lapsed because Chock had failed to "close the Business" by October 30, 1994.

Chock brought this action for breach of contract in the Supreme Court of New York, New York County, on October 6, 1994, seeking declaratory relief that Tetley was obligated to pay Chock for the unfunded pension liability in the amount of $1,683,467 plus interest. Tetley removed the case to the United States District Court for the Southern District of New York, on the basis of diversity of citizenship.

Tetley moved for summary judgment. It was undisputed that Tetley's liability depended on Chock's "clos[ing] the Business" by October 30, 1994. Because the contractual definition of "the Business" included "the selling of instant coffee," Tetley argued that the requirement of "closing the Business" would not be satisfied unless by October 30, 1994, Chock either (i) ceased selling instant coffee (whether or not produced at the Linden plant), (ii) ceased selling instant coffee to customers acquired from Tetley, or (iii) ceased selling Linden-produced instant coffee, none of which Chock had done.

In an Opinion and Order dated August 8, 1997, the district court granted Tetley's motion for summary judgment. Judgment was entered on August 14, 1997. This appeal followed.

## DISCUSSION

◾ Although in the conventional formulation of the rule, "in a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous," *Nowak v. Ironworkers Local 6 Pension*

*Fund,* 81 F.3d 1182, 1192 (2d Cir.1996), this case illustrates a refinement of that principle.

◾ Notwithstanding the existence of contractual ambiguities, summary judgment may be granted if under any of the reasonable interpretations the moving party would prevail. In such a case, the non-movant will have failed to show that there is any issue of material fact for trial; however the ambiguity were resolved, the movant would prevail. "If 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial" ' and summary judgment is appropriate." *Bouzo v. Citibank, N.A.,* 96 F.3d 51, 56 (2d Cir.1996)(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

◾ It is undisputed that Chock was required to "close the Business" before October 30 to trigger Tetley's liability. In light of the contract's definition of "the Business" as "processing and packaging in Linden, New Jersey and selling instant coffee," three plausible interpretations of the phrase "close the Business" have been advanced.

Under the first interpretation, in order to trigger Tetley's liability, Chock was required to close the Linden plant and stop selling instant coffee regardless where produced, since "the Business" includes "selling instant coffee." Neither the source of the coffee nor the identity of the buyers would be material. Under the second interpretation, Chock was required to close the plant and stop selling instant coffee to customers it had obtained from Tetley. On this view, the "Business" purchased by Chock under the contract was *Tetley's* business of processing, packaging, and selling instant coffee. Given that Chock had an instant coffee business before entering into the contract, the contract could be read as requiring only that Chock "close" that which it bought from Tetley—including the plant in Linden and the business of selling instant coffee to customers acquired from Tetley. Finally, under the third interpretation, the Business included sales of instant coffee only to the extent it was processed at the Linden plant, and Chock could close the

Business by closing the plant and ceasing to sell that instant coffee.

It is undisputed that Chock failed to satisfy any of these three alternative conditions: after October 30, Chock continued to sell instant coffee; it continued to sell instant coffee to customers acquired from Tetley; and it continued to sell instant coffee produced at the Linden plant. Unless Chock identified some other plausible interpretation of the contract, summary judgment in favor of Tetley was appropriate.[3]

Chock maintains the contract is susceptible of such an interpretation, under which it could "close the Business" by closing the Linden plant, notwithstanding its subsequent sales of Linden-produced instant coffee to liquidate its inventory. The district court rejected this interpretation on the ground that the definition of "the Business" unambiguously included "selling instant coffee." We agree.

In making this argument, Chock is undertaking to rewrite the contract. The contract did not require Chock to close the *plant;* it required Chock to close "the Business," and "the Business" included the selling of instant coffee. Where the definition of the Business included the selling of instant coffee, and Chock continued to sell instant coffee after the specified date, we cannot agree that it had "closed" the Business. Closing the plant did not satisfy the contract's requirement.

Because Chock failed to identify any reasonable construction of the contract under which it would be entitled to prevail, summary judgment was properly granted in favor of Tetley.

### CONCLUSION

The judgment of the district court is affirmed.

BRIEANT, District Judge, dissenting:

I respectfully dissent, at least to the extent that I believe the question presented on appeal should be certified to the New York Court of Appeals for an authoritative decision applying New York law as contemplated by Second Circuit Local Rule § 0.27 and New York Court of Appeals Rule § 500.17.

The crucial phrase "elect to close the business" is not defined in the agreement. Tetley has advanced three possible interpretations of that phrase, and Chock has advanced a fourth. The majority rejects Chock's interpretation and concludes that because Tetley would prevail under any one of its three interpretations there is no genuine issue of material fact for trial. Existence of these numerous conflicting interpretations, in my view, confirms the ambiguity in the language of the agreement and standing alone precludes summary judgment.

---

**3.** Judge Brieant argues with some force that the first two readings are not likely to have been the intention of the parties. He may be right that Chock could not sensibly have undertaken to abandon altogether the sale of instant coffee, merely to avoid bearing the cost of the plan's shortfall. It might also have been unwilling to give up the customers acquired from Tetley for which it paid a fair price. Judge Brieant is less convincing as to the third possible interpretation—the termination of sale of inventory produced at the Linden plant. This interpretation did not force Chock to dispose of the Linden inventory unprofitably or wastefully, as Judge Brieant suggests. All the contract required was advance planning, so that Chock would sell the Linden inventory before the fifth anniversary. We can see no reason to doubt that the parties might reasonably have contracted with this understanding.

Moreover, such an interpretation is not so disadvantageous to Chock that we should attribute it to a lawyer's mistake, as Judge Brieant implies.

Chock could easily have met this requirement. The problem occurred not when the contract was written, but five years later when Chock undertook to trigger Tetley's obligation, but did so without carefully reading the contract's requirements.

In short, we see no merit to Judge Brieant's contention that this reading of the contract reduces it to "gibberish [that cannot] reflect the objective intentions of the parties." The dissent's willingness to rewrite a carefully negotiated contract, furthermore, would give rise to highly undesirable commercial uncertainty.

Nor do we find this a suitable occasion to burden the New York Court of Appeals by certification of the question. The issue involved in the appeal does not raise a question of the meaning of New York law of general application. It does not concern an unsettled issue of New York law. And we see no reason to believe that a New York court would come to a different conclusion than we have.

I have a fifth possible interpretation: the licensed New York attorney retained by Chock to draft the agreement was inept and inexact; he or she failed to distinguish between closing *"the Business"* and closing *"the manufacturing facility at Linden, New Jersey."* [1] The latter was the true intendment of the parties, and this may be ascertained by a court from all of the surrounding facts and circumstances known to the parties at the time they contracted, including their purposes in contracting and the benefits sought by each. New York does not punish clients for obvious lawyer mistakes which harm nobody. *Nicholos v. Cashelard Restaurant, Inc.,* — A.D.2d ——, 672 N.Y.S.2d 98, 100–01 (1st Dep't 1998); *Schwartz v. Schwartz,* 153 A.D.2d 935, 937, 545 N.Y.S.2d 741, 743 (2d Dep't 1989).

The following facts are obvious from the context, undisputed or easily established at a plenary trial. Tetley had a manufacturing facility at Linden, New Jersey ("the Linden plant" or "the plant"), at which it was producing instant coffee. The Linden plant had a larger capacity than necessary for Tetley's own use, and instant coffee was but a small part of Tetley's business. The plant was a high cost operation and only marginally profitable for Tetley. The effort devoted to its management could have better been applied to Tetley's core business, which is the production and sale of tea.

Based on these facts Tetley's management decided to get out of the instant coffee production business associated with the Linden plant. Had Tetley done so simply by closing the Linden plant, it would have triggered the immediate payment of the unfunded pension costs which are the subject of this lawsuit, as well as significant costs in terminating the unionized production employees. Tetley would have lost the economic value of the experienced staff engaged in the sale of instant coffee to private brands and been left with a vacant factory.

To avoid these drawbacks, Tetley sought to engage in a transaction with Chock. By acquiring the business Chock was able to close its own smaller plant in Queens County and it acquired Tetley as a customer for instant coffee for at least a three-year period. Chock also acquired a covenant not to compete, together with the Tetley private brand customer lists, the sales staff of Tetley's instant coffee enterprise, and other tangibles and intangibles.

When entering the contract it was apparent to both sides that consideration had to be given to the possibility that Chock also would have difficulty maintaining the profitability of the Linden plant and that, were Chock to close that plant, Tetley's unfunded obligations to the pension plan would become due from Chock. It was important to Tetley to secure and define the parties' respective rights and obligations in the event of this foreseeable plant closure. The parties bargained for Chock's option to elect in its sole judgment to close "the Business," meaning thereby, in my opinion, the Linden plant, within five years, and thereby shift Tetley's pension obligation back to Tetley. The parties further agreed that should Chock elect to do so, it would be required to pay a two million dollar penalty for surrendering its lease to the Linden plant, title of which remained in Tetley, and Tetley would become obligated to pick up the unfunded pension costs. The discharge of the production employees resulting from closing the Linden plant would trigger payment of these unfunded pensions costs. Both parties to the negotiations understood this.

It bears emphasis that the contract was so structured as to deter Chock from making an economically unjustified decision to close the Linden plant. In closing the plant Chock faced substantial costs, including the cost of terminating the production employees, surrendering the lease, and sending the machinery to Mexico where cheaper, non-union labor now produces instant coffee for Chock and also apparently for Tetley. Chock would not close the plant on a mere whim.

**1.** The scrivener may have been a highly capable attorney who was having a bad day, punctuated by interruptions from the telephone and the importunities of partners and other clients, vicissitudes not faced by federal judges, who quickly forget the working conditions of a commercial lawyer. In fairness, I note that counsel for Chock on this appeal did not draft the contract.

The objectively determinable intention of the parties was that the election would be to close *the Linden facility*. There was no way that Chock could close *"the Business"* as defined in the agreement, unless all at once it withdrew totally from the instant coffee business and sacrificed the sales staff, the private brand customer lists, the covenant not to compete and its own good will, a highly unlikely event not within the contemplation of any party.

It is irrational to assume that it was a material issue in the negotiations, which made any economic difference whatsoever to Chock or Tetley, whether Chock made liquidating sales of inventory produced at the Linden plant after the expiration of the five-year period. It was obviously within the contemplation of both parties that if Chock elected to close the Linden plant it would remain in the instant coffee business, it would continue to employ the non-manufacturing employees acquired from Tetley and it would continue to sell instant coffee, produced or acquired wherever, to its own customers, to Tetley and to the private brand customers it obtained from Tetley as part of its purchase of the business. Indeed, in transferring the production of instant coffee to Mexico, Chock made arrangements to accumulate inventory at Linden precisely for the purpose of being able to continue to service Tetley's own requirements for instant coffee. I do not agree that Chock was required to "close the *Business*" before October 30, 1994 if closing the *Business* means Chock had to give up selling instant coffee. Such was never the intention of the parties, and indeed the majority concedes that "[n]either the source of the coffee nor the identity of the buyers would be material [to Tetley]." Maj. Op. at 204.

The third alternative suggested by the majority required that Chock dispose of all the inventory at Linden before October 30, 1994 in a bulk sale to a jobber or simply throw it in the river. This interpretation is also implausible because once Chock elected to close the plant it made no difference to Tetley

what was done with the inventory or when it was done.[2]

The only plausible interpretation of the objective intent of the contract is that both parties contemplated the effect on the pension accruals of a decision by Chock to close the Linden plant within five years, and that the scrivener simply failed to express with sufficient clarity their resolution that the burden of Tetley's unfunded pension accruals would shift to Chock only after five years of presumably successful operations at Linden.

The obvious purpose of section 12 of the agreement was to ensure that Chock would not recover the pension liability which went with the plant and its workforce unless, within the time period agreed upon, it made a permanent election to cease operating the Linden plant and incur no further liability to the pension plan. Chock did this prior to the October 30, 1994 deadline. Its sale of the remaining inventory after that date, made in part to Tetley, had no impact on the finality of the election to close the plant, on the triggering of the pension accrual liability, or on the possibility of accruing further pension liability, all of which flow not from being in the business, but from operating the Linden plant.

If *"close the Business"* in the context of this case means anything more than closing *the manufacturing facility at Linden, New Jersey*, the contract as written is so much gibberish and does not reflect the objective intentions of the parties. I am convinced that a New York court would place a reasonable construction on the contract to read the word *business* as meaning *the instant coffee manufacturing facility at Linden, New Jersey*. Certifying this issue to the state court indicates not a willingness to rewrite this contract, but rather a conviction that under New York law the primary goal of courts in interpreting contracts is to carry out the obvious intention of the parties as evidenced by the entire agreement and context.

It is not a foregone conclusion, as the majority implies in footnote three, that a New York court would ignore the context of

---

**2.** It is next to impossible to close down a processing plant without having some inventory and

work in progress.

this agreement and find in Tetley's favor as a matter of law. Where the document viewed in light of the knowledge of both parties and the factual background for the transaction makes clear the parties' overall intention, a New York court examining isolated provisions will choose that construction which will carry out the plain purpose and object of the agreement. *See Kass v. Kass*, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 180–81 (1998) ("[C]ourts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.' ") (quoting *William C. Atwater & Co., Inc. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418, 419 (1927)); *Village Nursing Home v. Axelrod*, 146 A.D.2d 382, 390, 541 N.Y.S.2d 377, 382 (1st Dep't 1989) ("In construing a contract, the agreement is to be read as a whole and every part will be interpreted with the whole in seeking to give each clause its intended purpose in the promotion of the primacy and dominant purpose of the contract."); *Matter of Friedman*, 64 A.D.2d 70, 82, 407 N.Y.S.2d 999, 1006 (2d Dep't 1978) ("Parties to an agreement are presumed to act sensibly ... and an interpretation that produces an absurdly harsh result is to be avoided. Since there exists, in every contract, an implied covenant of good faith and fair dealing, the courts may take into consideration the fact that one construction would make the contract unreasonable. Thus courts will endeavor to give the construction most equitable to both parties instead of one which will give one of the parties an unfair or unreasonable advantage over the other.") (internal citations and quotations omitted).

Our obligation to *Erie* principles commands us to apply a sensible meaning here. Therefore, I respectfully dissent.