Sharlene GILES, Ruby Belgrove, and Mary O'Garro Greene, on behalf of themselves and all other employees similarly situated, Plaintiffs,

v.

CITY OF NEW YORK, Defendant.

No. 96 CIV. 2655(CBM).

United States District Court,
S.D. New York.

March 10, 1999.

Joan Stern Kiok, New York City, NY, for Plaintiffs.

New York City Department of Law, by Barbara B. Butler, New York City, NY, for Defendants.

### OPINION

MOTLEY, District Judge.

The plaintiffs, a class of employees of the defendant, the City of New York ("City"), brought this action to recover unpaid overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* Both parties moved for summary judgment and Magistrate Judge Ronald L. Ellis recommended that the plaintiffs' motion be granted in part and denied in part and that the defendant's motion be granted. For the following reasons, the court finds that the critical contractual language is ambiguous and therefore denies both parties' motions for summary judgment.

### I. Background

The plaintiffs are approximately 225 City employees working in the Administration for Children's Services ("ACS"), the Human Resources Administration ("HRA"), and the Department of Juvenile Justice ("DJJ"). With the titles of "Houseparent" and "Senior Houseparent," the plaintiffs work and reside in City facilities that house juveniles who are in City custody for various reasons.[1] Houseparents are represented by Local 371 of District Council 37, American Federation of State, County, and Municipal Employees ("Local 371" and "DC 37"). DC 37 and the City entered into three collective bargaining agreements ("CBAs") covering Houseparents' terms of employment, *see* Compl. ¶¶ 18–21, 27–28:(1) the Citywide Agreement, which covers the majority of the City's civilian employees ("Citywide CBA"), *see* Pls.' Ex. G[2]; (2) the 1992–1995 Social Services and Related Titles Agreement ("Social Services CBA"), which covers the bargaining unit that includes Houseparents, *see* Pls.' Ex. F; and (3) the 1992–1995 DC 37 Equity Panel Report of the Joint Panel ("Equity CBA"), *see* Pls.' Ex. E, which allocates funds to DC 37 to distribute among members for equity purposes.

Houseparents traditionally work a demanding schedule of well over 40 hours per week. Before 1986, some Houseparents regularly worked 120 hours per week; since then, the standard workweek has

---

1. For simplicity, references to "Houseparents" in this opinion will refer to both "Houseparents" and "Senior Houseparents" unless otherwise specified.

2. "Pls.' Ex." and "Def.'s Ex." refer to exhibits accompanying the plaintiffs' and defendant's summary judgment motions, respectively.

been 60 hours with additional hours commonly assigned. In 1986, municipal employees became covered by the FLSA, which requires an overtime pay rate of 1.5 times the worker's regular pay rate for hours in excess of 40 per week. Until July 1, 1994, the Citywide CBA and the Social Services CBA provided Houseparents an annual salary, which is easily convertible into a weekly salary, and assigned them a regular workweek of 60 hours. *See* Pls.' Ex. F, Art. III, § 1b; Pls.' Ex. G, p. 11. No CBA listed an hourly rate, however.

The lack of an explicit hourly rate for the period before July 1, 1994 led to overtime pay disputes. More specifically, it was unclear how many hours the weekly salary covered. This left unclear what Houseparents' regular hourly rate was, making it equally unclear how to calculate their overtime rate of 1.5 times their regular rate. In *Adams, et al. v. Dep't of Juvenile Justice, et al.*, 1996 WL 82404, No. 93 Civ. 8042(PKL) (S.D.N.Y. Feb. 26, 1996), *rev'd in part*, 143 F.3d 61 (2d Cir. 1998), a class of Houseparents challenged the City's practice of calculating regular hourly rate, for overtime purposes, by dividing the weekly salary by 70 hours. On April 21, 1995, the City began dividing by 60 hours, retroactively to July 1, 1994. *See* Pls.' R. 56.1 Stmt. ¶ 32; Pls.' Ex. M. The City has settled all claims regarding the period before July 1, 1994 in both *Adams* and this case.

The only remaining dispute is whether, for the period since July 1, 1994, Houseparents' regular hourly rate is their weekly salary divided by 40 hours or their weekly salary divided by 60 hours. The Social Services CBA listed these annual salaries as based on a 60 hour workweek:

| TITLE | Hired After 6/30/93 | Hired Before 7/1/93/ | Maximum |
|---|---|---|---|
| Houseparent | $25,510 | $26,540 | $37,004 |
| Senior Houseparent | $30,213 | $31,433 | $39,874 |

Pls.' Ex. F, pp. 13, 16. The Equity CBA of November 22, 1994 attempted to clarify the ambiguity that the other CBAs left by stating only a weekly salary. Unfortu-

nately, the parties also assert varying interpretations of the Equity CBA, which in relevant part reads as follows:

> Effective July 1, 1994, notwithstanding the current provisions of the Social Services and Related titles Agreement, the annual salaries rates [sic] for the titles of Houseparent and Senior Houseparent shall be based on a work week of 40 (forty) hours (2088 hours per annum). Effective July 1, 1994, employees hired to work on a twelve (12) hour day on a per diem basis shall continue to be paid for the first eight (8) hours at straight time (1X) and for the remaining four (4) at time and one-half (1½X) based on the hourly rates set forth below:

| TITLE | Hired After 6/30/93 | Hired Before 7/1/93 | Maximum |
|---|---|---|---|
| Houseparent | $12.2174 | $12.7107 | $17.7222 |
| Senior Houseparent | $14.4698 | $15.0541 | $19.0967 |

> Nothing set forth herein shall preclude the employer from continuing to assign employees to a work week in excess of 40 hours per week.

Pls.' Ex. E, Art. XVII, ¶ 6.

The plaintiffs contend that the rates listed in the Equity CBA are the non-overtime regular hourly rates, which would make the overtime rates one-half higher. The City counters that the Equity CBA's listed rates are not the regular rates but the time-and-a-half premium overtime rates, which would make the regular rates one-third lower. In August 1995, Local 371 filed a request for arbitration of this dispute, *see* Pls.' Ex. P, which went to a hearing in July 1996. Local 371 argued that the Equity CBA's plain language makes clear that its listed hourly rates are regular, non-overtime rates. The City asserted a contrary interpretation of the text and argued that DC 37 and the City, the two parties to the CBA, did not intend a reading that implausibly would allocate to a few hundred Houseparents $9 million of $15 million in equity funds that were available to 120,000 DC 37 members. *See* Def.'s Ex. B. On July 3, 1997 the arbitrator issued an opinion deciding the issue in

favor of the City. *See* Def.'s Ex. A; Pls.' Ex. N.

The plaintiffs filed this action in April 1996, after Local 371 filed for arbitration but before the arbitration went to hearing. Both parties have moved for summary judgment. The City argues that the arbitrator's ruling that the Equity CBA's listed hourly rates were premium overtime rates merits adherence and binds this court under the doctrine of issue preclusion. The plaintiffs argue that the arbitrator's ruling does not lead to preclusion in this action and reflects an impermissible interpretation of how the relevant CBA language comports with the FLSA.

## II. Analysis

### A. Arbitration as Bar to Plaintiffs' Claims

The City presents two arguments that the CBA arbitration provisions are dispositive against the plaintiffs. First, it argues that because of a union agreement to arbitrate disputes with the employer, the proper forum for the plaintiffs' claim is arbitration, not federal court. Second, it argues that the outcome of Local 371's arbitration leads to issue preclusion, collaterally estopping the plaintiffs from asserting a CBA interpretation contrary to the arbitration outcome. The court rejects both of these arguments.

### 1. Exhaustion of Arbitration Remedy

The City argues that their union's agreement to arbitrate binds the plaintiffs to the extent of precluding their action in federal court:

> Plaintiffs are members of a public employee union that has negotiated a collective bargaining agreement with the Defendant ... [that] specifically provides a procedure for resolution of any dispute, controversy or claim concerning or arising out of the application or interpretation of the Fair Labor Standards Act. Plaintiffs at least must exhaust this procedure before going to court.

Answer ¶ 19. The Social Services CBA outlines a dispute resolution procedure culminating in binding arbitration for grievances as to: (a) CBA interpretation; (b) alleged violations of City rules; (c) worker assignments; (d) holding of examinations; (e-h) disciplinary actions and charges against workers. *See* Pls. Ex. F, Art. VI, §§ 1(a)–1(h). After internal dispute resolution efforts through Steps I, II, and III, Step IV is arbitration: "an appeal from an unsatisfactory determination at STEP III may be brought solely by the Union.... The costs and fees of such arbitration shall be borne equally by the Union and the Employer." *Id.*, Art. VI, § 2. This arbitration provision seeks to be the exclusive remedy for the above-listed covered grievances:

> As a condition to the right of the Union to invoke impartial arbitration ... the employee or employees and the Union shall be required to file with the Director of the Office of Collective Bargaining a written waiver of the right, if any, of the employee and the Union to submit the underlying dispute to any other administrative or judicial tribunal.

*Id.*, Art. VI, § 3.

■ This CBA language does not bar the plaintiffs' FLSA complaint in federal court, however, because it does not explicitly cover claims of individual statutory rights. While one of the "guiding principles of the law of arbitration ... requires full enforcement of arbitration clauses, ... [a] second principle protects parties from being compelled to arbitrate claims they did not agree to arbitrate." *N.Y. v. Oneida Indian Nation*, 90 F.3d 58, 59 (2d Cir.1996). Under *Wright v. Universal Maritime Serv. Corp.*, —— U.S. ——, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), courts will not find that a CBA mandatory arbitration provision includes individual statutory rights where the CBA lacks a "clear and unmistakable waiver of the covered employees' rights to a judicial forum." *Id.* at 397, 119 S.Ct. 391. Here, the list of

covered grievances did not clearly include FLSA or other statutory claims.

Construed broadly, the CBA provision at issue here is the sort of generalized agreement to arbitrate an amorphously defined group of disputes that *Wright* found inadequate to cover statutory rights claims because "*Gardner–Denver* at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA." *Id.* at 396 (citing *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). Construed less broadly, the CBA provision only enumerates specific subjects that must be submitted to arbitration in a list that does not include FLSA claims. Whether construed broadly or narrowly, the CBA provision is not a "clear and unmistakable waiver of the covered employees' rights to a judicial forum" for claims of individual rights under statutes such as the FLSA. Courts held similarly even before *Wright*. *See, e.g., Knight v. Southern New England Tel. Corp.,* No. 3:97CV1159 (WWE), 1998 WL 696014, at *3 (D.Conn. Sept.18, 1998) ("[P]laintiff's failure to arbitrate her Title VII and ADA claims is not a bar to her pursuing an action in this court ... [where CBA] does not specifically require arbitration of those claims.").

Although *Wright* did "not reach the question whether such a waiver would be enforceable," *id.,* the Second Circuit has. *Tran v. Tran,* 54 F.3d 115 (2d Cir.1995), held that CBA mandatory arbitration provisions cannot bar union members from bringing FLSA claims to court. A majority of circuits are in accord. *See Albertson's, Inc. v. United Food & Commer'l Workers Union, AFL–CIO & CLC, et al.,* 157 F.3d 758, 761–62 (9th Cir.1998) (following *Tran* as to FLSA rights and noting that a majority of circuits have done so for various statutory rights). Unions and their members have relied on this rule for decades, since *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), held that CBA mandatory arbitration provisions do not preclude members' Title VII actions and *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), expanded that rule to FLSA and § 1983 claims, respectively. While *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), allowed an individual employment contract to require arbitration of ADEA claims, neither the Supreme Court nor the Second Circuit has expanded *Gilmer* to cover CBA mandatory arbitration nor to cover statutory claims under statutes other than the ADEA. Accordingly, "[t]here is nothing in *Gilmer* which appears to throw anything but favorable light upon the continuing authority of *Barrentine.*" *Tran,* 54 F.3d at 117. The same is true for *Wright,* which explicitly declined to address the issue. *Wright,* —— U.S. at ——, 119 S.Ct. at 397.

Even if some CBA mandatory arbitration provisions could cover statutory rights, this one cannot because the union, the only party who can bring the claim, must pay half of the arbitration fees. Pls. Ex. F, Art. VI, § 2. When individual rights under statutes such as the FLSA are at issue, courts often refuse to enforce arbitration agreements requiring fee-splitting. "Requiring plaintiffs to pay for access 'would surely deter the bringing of arbitration,' running counter to Congressional intent" underlying such statutory rights. *Martens, et al. v. Smith Barney, et al.,* 181 F.R.D. 243, 256 (S.D.N.Y.1998) (quoting *Cole v. Burns Int'l Secur. Servs.,* 105 F.3d 1465, 1468 (D.C.Cir.1997) (rejecting fee-splitting provision because "an employee can never be required ... to pay an arbitrator's compensation in order to secure the resolution of statutory claims under Title VII")). *See also Shankle v. B–G Maintenance Mgmt. of Colo., Inc.,* 163 F.3d 1230, 1235 (10th Cir.1999) (holding unenforceable an arbitration agreement

requiring plaintiff to split arbitrator fees because it prescribed "mandatory arbitration as a term of continued employment, yet failed to provide an accessible forum in which he could resolve his statutory rights"). Courts differ on this issue, sometimes based on the size of the financial burden. *See, e.g., Howard v. Anderson, et al.,* No. 96 Civ. 919(SWK), 1999 WL 79497 (S.D.N.Y. Feb.17, 1999) (collecting divergent cases and finding a $500 filing fee "not a barrier to the vindication of Howard's statutory rights" but noting that higher fees could be). In the CBA context, however, the problem is worse because any financial burden on the union only exacerbates the existing problem that the union may have insufficient incentive to press a member's individual statutory claim vigorously. Accordingly, a CBA mandatory arbitration provision featuring fee-splitting is unenforceable because it deprives individuals of the required "reasonable right of access to a neutral forum." *Cole,* 105 F.3d at 1468–69.

Finally, the requirement that union and member both waive their rights to proceed in any other forum further confirms that this provision does not aim to be a mere first step that plaintiffs must exhaust. Rather, it aims to make arbitration an exclusive forum, in contravention of *Gardner–Denver, Tran,* and other precedents protecting a union member's right to press a claim that the employer violated the member's individual statutory rights. In sum, if utilized, arbitration does not prevent an FLSA action; if (as here) not utilized, the availability of arbitration does not preclude an FLSA action.

### 2. Issue Preclusion Based on the Arbitral Decision

The City argues that Local 371's arbitration precludes the plaintiffs from pressing issues that the arbitrator decided in the City's favor. It is issue preclusion, not claim preclusion, that the City argues here. "[T]he City does not argue that plaintiffs are precluded from bringing a claim that the terms of the Equity Panel Report ... violate their rights under the FLSA. However, ... an arbitration award has determined what the terms of the Equity Panel Report are," precluding the plaintiffs from asserting a contrary interpretation of those terms. Def.'s Mem. Opp. Pls.' Motion Summ. J. at 7. Issue preclusion, also known as collateral estoppel,

> bars a party from raising a specific factual or legal issue in a second action when the party had a full and fair opportunity to litigate the issue in a prior proceeding.... [C]ollateral estoppel applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Transaero, Inc. v. La Fuerza Aerea Boliviana,* 162 F.3d 724, 731 (2d Cir.1998).

Issue preclusion based on a prior arbitration is permissible, but not mandatory, because "application of collateral estoppel from arbitral findings is a matter within the broad discretion of the district court." *Universal Am. Barge Corp. v. J–Chem, Inc.,* 946 F.2d 1131, 1137 (5th Cir.1991). "Where the requirements are not met, it would be error to apply collateral estoppel; where the requirements are met, it would not be error (though it may waste judicial resources) to decline to apply collateral estoppel." *Kroeger v. United State Postal Serv.,* 865 F.2d 235, 239 (Fed.Cir.1988). (addressing preclusion from arbitration). Accordingly, a post-arbitration proceeding is not "bound by the arbitrator's factual conclusions.... '[T]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate.'" *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO,* 954 F.2d 801, 809–810 (2d Cir.1992) (quoting *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (also

citing *McDonald v. City of West Branch,* 466 U.S. 284, 292, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984))).

The problem with applying collateral estoppel here is that the plaintiffs were not parties to the arbitration; only their union was a party. It is because preclusion rules target the party who seeks to "relitigate identical claims or issues," a party faces preclusion only if it had a sufficiently "full and fair opportunity to litigate" the dispute in the prior proceeding. *Transaero, Inc.,* 162 F.3d at 731. Under the right circumstances, a union's arbitration of an issue could give its members a full and fair opportunity to press that issue. However, a conflict of interest between two parties prevents one's arbitration outcome from subjecting the other to issue preclusion. *See Universal Am. Barge Corp. v. J–Chem, Inc.,* 946 F.2d 1131, 1139 (5th Cir. 1991) (holding that indemnitee's arbitration would not collaterally estop indemnitor because "conflict of interest between the indemnitor and the indemnitee could interfere with full and fair litigation of issues"); *Jamaica Commodity Trading Co. v. Connell Rice & Sugar Co.,* 766 F.Supp. 138, 151 (S.D.N.Y.1991) (holding same where indemnitee could not fully argue indemnitor's position without risking liability because "[a]n indemnitor is bound by the result of an arbitration to which it was not a party only when its interests have been adequately represented . . . by the indemnitee"). "[T]he *Parklane* requirement that the defendant in the first action have incentive in that action to litigate the lawsuit fully and vigorously also mandates conflict-free representation of issues sought to be precluded." *Universal Am. Barge Corp. v. J–Chem, Inc.,* 946 F.2d 1131, 1140 (5th Cir.1991) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 332, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)).

In *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), the Supreme Court noted that a conflict of interest between union and member may make it inappro-priate for union arbitration to have preclu-sive effect in members' FLSA minimum wage lawsuits in federal court. "[E]ven if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigor-ously in arbitration." *Id.* at 742, 101 S.Ct. 1437. In *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Supreme Court similarly held that a union arbitration would not lead to issue preclusion in a member's Section 1983 action because "were an arbitration award accorded pre-clusive effect, an employee's [claim] . . . might be lost merely because it was not in the union's interest to press his claim vig-orously." *McDonald v. City of West Branch,* 466. U.S. 284, 291, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). In the presence of such a conflict of interests, a union arbitra-tion is probative but not preclusive, as it "may be admitted into evidence . . . [with] weight to be accorded . . . in the court's discretion with regard to the facts and circumstances of each case." *Barrentine,* 450 U.S. at 743 n. 22, 101 S.Ct. 1437; *see also McDonald,* 466 U.S. at 291, 104 S.Ct. 1799 (citing *id.*).

■ Union and member interests here were in sufficient conflict that it would be inappropriate for the arbitration findings to lead to issue preclusion against the plaintiffs in this action. The City, which is the party arguing in favor of issue preclu-sion, asserts that the plaintiffs' interpreta-tion of their salary entitlement "would re-sult in Houseparents . . . receiving about $9 million dollars out of the total $15 mil-lion allocated" by the Equity Fund for DC 37 to split among its 120,000 members "as DC 37 saw fit." Def.'s R. 56.1 Stmt. ¶¶ 13, 14, 33. Under the version of the facts given by the City (the party supporting issue preclusion), there is a serious union-member conflict of interest: a few hun-dred Houseparents are seeking more than half of a fund that DC 37 otherwise would

have discretion to split among 120,000 members.

With such a potential for conflicting interests on the issue, Local 371 could not represent the plaintiffs' position on the issue sufficiently for issue preclusion. More specifically, the court cannot rule that their union's arbitration gave the plaintiffs a sufficiently "full and fair opportunity to litigate" their interpretation of the CBA to deprive them of their day in court now. *Barrentine* envisioned union-member conflicts of just this sort in rejecting preclusion:

> Since a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation available, a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole.

450 U.S. at 742, 101 S.Ct. 1437. *See also McDonald,* 466 U.S. at 291, 104 S.Ct. 1799 ("The union's interests and those of the individual employee are not always identical or even compatible.... [T]he union may present the employee's grievance less vigorously, or make different strategic choices, than would the employee.").

Under *Barrentine* and *McDonald,* the plaintiffs need not prove that their representation was in fact inadequate for preclusion to be inappropriate. *See, e.g., Beason v. United Techs. Corp.,* No. Civ. A. 3:97CV2654CF, 1999 WL 79495 (D.Conn. Feb.10, 1999) (finding potential but unproven union-member conflict of interest sufficient for arbitration not to preclude in plaintiff's ADA and state civil rights action). Nevertheless, the plaintiffs' assertion of conflict of interest draws support from their claim that Local 371 inadequately pressed the contract issue by failing to call witnesses from DC 37, its parent union, which negotiated the relevant CBA provisions. *See* Def.'s Resp. to Pl.'s Objections to Magistrate at 3–4 ("DC 37 did not participate in the arbitration"). While it is not clear that this fact proves inadequate representation, it evidences exactly the sort "different strategic choices," and perhaps "less vigorous[ness]," that *McDonald,* 466 U.S. at 291, 104 S.Ct. 1799, feared in rejecting issue preclusion. The union's arbitration should not preclude the plaintiffs from pressing in court an issue that the arbitrator decided adversely to them. *See Kulavic v. Chicago & I.M. Ry.,* 1 F.3d 507, 511–17 (7th Cir.1993) (finding issue preclusion inappropriate because the limited arbitral proceedings insufficiently protected plaintiff's right to press issue).

## B. Summary Judgment in Disputes over Contract Interpretation

The basic summary judgment standard is that "[u]ncertainty as to the true state of any material fact defeats the motion." *Gibson v. Am. Broad. Companies,* 892 F.2d 1128, 1132 (2d Cir.1989). The non-moving party's burden is to produce concrete evidence sufficient to establish a genuine unresolved material issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). The court then must view the facts in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). The court neither weighs evidence nor resolves material factual issues, but only determines whether, after adequate discovery, any such issues remain unresolved because a reasonable fact finder could decide for either party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Gibson,* 892 F.2d at 1132.

In a contract dispute, when the contractual language is unambiguously in conformity with one side's interpretation,

summary judgment is appropriate, *see Chock Full O'Nuts Corp. v. Tetley, Inc.,* 152 F.3d 202, 204 (2d Cir.1998), and extrinsic evidence of the contracting parties' intentions cannot be considered in interpreting the contract, *see Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993). When the contractual language is ambiguous, extrinsic evidence of the parties' intent is admissible, *see id.,* including when the contract is a collective bargaining agreement. *See Amer. Fed. of Grain Millers, AFL–CIO, et al. v. Int'l Multifoods Corp., et al.,* 116 F.3d 976, 981 (2d Cir.1997) ("extrinsic evidence can be used to interpret ambiguous CBAs").

■ Despite contract ambiguity, summary judgment still may be appropriate if the moving party would prevail under any reasonable interpretation of the contract. *See Chock Full O'Nuts Corp.,* 152 F.3d at 204. Both the contract ambiguity and the extrinsic evidence are construed against a summary judgment movant, however. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). In sum, while contract ambiguity does not create a per se rule against summary judgment, it does add extrinsic evidence to the pool of evidence that must be sufficiently one-sided to make summary judgment appropriate.

### C. FLSA Overtime Provisions

The FLSA embodies a Congressional intent to "give specific minimum protections to *individual* workers." *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (emphasis in original). Its maximum hours provisions, "like the other portions of the Fair Labor Standards Act, are remedial and humanitarian in purpose. Such a statute must not be interpreted or applied in a narrow, grudging manner." *Tenn. Coal, Iron & R.R. Co., et al. v. Muscoda Local No. 123, et al.,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). Specifically, the FLSA requires that an employer compensate employees for hours in excess of 40 per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Though it complicates overtime calculations, it is permissible for compensation to be annual or weekly rather than hourly, *see* 29 C.F.R. § 778.109, because the Supreme Court has held that, for FLSA purposes, "[e]very contract of employment, written or oral, explicitly or implicitly includes a regular rate of pay for the person employed.... [T]he regular rate of pay [is] to be found by dividing the weekly compensation by the hours worked." *Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446, 461, 464, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948).

For employees who work over 40 hours per week, it may be difficult to determine an unstated regular hourly rate from a stated weekly salary because the contract may not disclose how many hours the weekly salary covers. The contracting parties may have intended for the weekly salary either to cover only the 40 non-overtime hours or to cover anticipated overtime hours as well. The City argues that the CBA-defined salary includes not just regular 40–hour compensation but also overtime compensation for 60 hours per week. "When employees regularly work more than forty hours a week and receive a standard wage each week the question arises whether the weekly payment genuinely represents payment at a regular rate for the first forty hours plus time and a half for the excess hours." *Nunn's Battery & Electric Co. v. Goldberg,* 298 F.2d 516, 519 (5th Cir.1962). The question is one of intent: how many hours did the employer and employee understand the salary to cover? *See* 29 C.F.R. § 778.113(a) (calculating regular hourly rate from weekly salary "by dividing the salary by the number of hours which the salary is intended to compensate").

The fact that an employee regularly works 60 or more hours does not, without more, indicate that the employee's weekly

salary was intended to include the FLSA overtime premium for all hours in excess of 40. *See Adams, et al. v. Dep't of Juvenile Justice, et al.,* 143 F.3d 61, 67 (2d Cir.1998) (noting, in addressing the regular hourly rate for Houseparents working 60 to 120 hours per week, that case "authorities do not resolve whether the salary of an employee who regularly works more than forty hours per week should or should not be presumed to include an overtime premium"). Unless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours. *See, e.g., Brennan v. Elmer's Disposal Serv., Inc., et al.,* 510 F.2d 84, 88 (9th Cir.1975) (noting the lack of "explicit agreement between the employer and the employees ... as to the designated rate"); *Wirtz v. Leon's Auto Parts Co., et al.,* 406 F.2d 1250, 1252 (5th Cir.1969) ("[An] indispensable factor[ ] for compliance with this statute ... [is] an explicit understanding between the parties as to the existence of a regular wage rate that is stepped up for overtime."); *Marshall v. R & M Erectors, Inc., et al.,* 429 F.Supp. 771, 780 (D.Del.1977) ("[F]ixed salary will not be deemed to include an overtime component in the absence of an express agreement."); *Dunlop v. Vita–Mart of Cambridge, Inc., et al.,* No. 72–1222–M, 72–1223–S, 1975 WL 1209, *2 (D.Mass. Oct.31, 1975) ( "[A]greement for a fixed weekly pay for more than forty hours of work per week only complies with [the FLSA] ... if there is an explicit understanding between employer and employee as to regular and overtime hourly rates."), *aff'd* 542 F.2d 1163 (1st Cir.1976); *Wirtz v. Harper Buffing Mach. Co., et al.,* 280 F.Supp. 376, 380 (D.Conn.1968) ("The employees were hired for a fixed weekly salary and ... never informed that that salary included compensation at one and one-half times the regular rate.").

Accordingly, an employer asserting that an employee's weekly salary includes FLSA-required overtime payments must prove not just that the employee regularly works over 40 hours per week, but also that the employer and employee contracted for the weekly salary to include the overtime period. There is a rebuttable presumption that a weekly salary covers 40 hours; the employer can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours. This rule follows from the need to construe the FLSA sufficiently broadly merely to ensure compliance with its basic overtime pay mandate. "The important objective is assurance that the employees and the employer are aware that overtime compensation in a specific amount is included in the contract. Unless both sides clearly understand this to be so, it cannot be said ... that the purposes of the law in requiring additional pay for overtime work are being achieved." *Id.* at 381. The Supreme Court instructs more generally that courts must construe the FLSA overtime provisions broadly; a finding that a salary included overtime, in the absence of proof of an agreement so stating, would be the sort of "narrow, grudging" FLSA application that the Court rejected soon after enactment. *Tenn. Coal, Iron & R.R. Co., et al. v. Muscoda Local No. 123, et al.,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944).

**D. Interpretation of the Disputed CBA Terms**

The Equity CBA provisions seem to support the plaintiffs' interpretation that the listed rates are regular hourly rates, not premium overtime rates:

Effective July 1, 1994, notwithstanding the current provisions of the Social Services and Related Titles Agreement, the annual salaries rates [sic] for the titles of Houseparent and Senior Houseparent shall be based on a work week of 40 (forty) hours (2088 hours per annum).

Effective July 1, 1994, employees hired to work on a twelve hour basis on a twelve hour day on a per diem basis shall continue to be paid for the first eight (8) hours at straight time (1X) and for the remaining four at time and one-half (1½X) based on the hourly rate set forth below:

| TITLE | Hired After 6/30/93 | Hired Before 7/1/93 | Maximum |
|---|---|---|---|
| Houseparent | $12.2174 | $12.7107 | $17.7222 |
| Senior Houseparent | $14.4698 | $15.0541 | $19.0967 |

Nothing set forth herein shall preclude the employer from continuing to assign employees to a work week in excess of 40 hours per week.

Pls.' Ex. E, Art. XVII, ¶ 6. The first of the above-listed paragraphs changes the weekly basis of Houseparents' salary from 60 hours to 40 hours. The next paragraph introduces the hourly rates that, over a year of 40–hour weeks, add up to the yearly salaries listed in the Social Services CBA:

| TITLE | Hired After 6/30/93 | Hired Before 7/1/93 | Maximum |
|---|---|---|---|
| Houseparent | $25,510 | $26,540 | $37,004 |
| Senior Houseparent | $30,213 | $31,433 | $39,874 |

Pls.' Ex. F, pp. 13, 16. Thus, as Magistrate Judge Ellis noted, "If the provisions in the Equity Panel Report in fact read, as they appear to, that plaintiffs' salaries are now intended to compensate only forty hours of their regular sixty hour workweek, then plaintiffs must prevail." Report & Recommendation at 10.

■ The problem is that there is sufficient ambiguity in the text to support the City's counter-interpretation. It is possible to read the listed rates as referring to only the last part of the prior sentence: "for the remaining four [hours] at time and one-half (1 ½X) based on the hourly rate set forth below." Pls.' Ex. E, Art. XVII, ¶ 6. The City argues that, mainly because of this ambiguity, "the language of the [Equity CBA] ... was obviously ambiguous." Def.'s Reply Mem. Supp. Motion Summ. J. & Opp. Pl.'s Motion Summ. J. at 5. If these listed rates were overtime rates,

that would change the annual salaries listed in the Social Services CBA, but it would preserve the regular hourly rates on which those salaries may have been based.

Although the City's interpretation is contrary to the plaintiffs' more obvious interpretation, it is a permissible reading of the Equity CBA. The Equity CBA explains its figures, and exactly how they modify the Social Services CBA, "somewhat unartfully," as Magistrate Judge Ellis noted. Report & Recommendation at 4. This lack of clarity is sufficient that a reasonable fact finder could find for the City by concluding other than that "the provisions in the Equity Panel Report in fact read[ ] as they appear to." *Id.* at 10. The City is entitled to attempt to persuade the fact finder that, due to the muddiness of critical portions of the Equity CBA, the listed hourly rates are not the regular rates that they appear to be, but the premium overtime rates that the City claims they are.

The City's task of proving a questionable interpretation of the Equity CBA is difficult enough that summary judgment might be appropriate in the face of the contractual ambiguity. However, the City's extrinsic evidence supporting its interpretation is strong enough that it could persuade a reasonable fact finder to support an otherwise questionable textual interpretation. The City persuaded the arbitrator that it is implausible that DC 37 and the City could have agreed to raise the plaintiffs' paychecks by such a drastic amount and such a drastic means as taking $9 million of the $15 million in equity funds that were supposed to be available to all 120,000 DC 37 members. *See* Def.'s Ex. A; Def.'s Ex. B. Even though the arbitrator's findings do not lead to issue preclusion, they are admissible as support for the City's presentation of the same argument here.

There is just enough ambiguity in the contractual language to allow consideration of extrinsic evidence in interpreting that language. Once admitted, the extrinsic ev-

idence is sufficient to allow a reasonable fact finder to support the City's interpretation. Accordingly, the proper interpretation of the relevant contractual language is a question of fact and both parties' motions for summary judgment should be denied.

III. Conclusion

For the above reasons, the plaintiffs' motion for summary judgment is denied and the defendant's motion for summary judgment is denied.

So ordered.