**In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtor.**

**In re LTV STEEL COMPANY, INC. and Tuscaloosa Energy Corporation, Debtors.**

**UNITED MINE WORKERS OF AMERICA, Appellant,**

v.

**LTV STEEL COMPANY, INC. and Tuscaloosa Energy Corporation, Appellees.**

**No. 386, Docket 89–5024.**

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1989.

Decided Dec. 12, 1989.

Barbara J. Hillman, Chicago, Ill. (Mark S. Stein, Michael H. Holland, Cornfield and Feldman, Chicago, Ill., of counsel; John Quint, Markewich, Friedman & Markewich, P.C., New York City, of counsel), for appellant United Mine Workers of America.

Sharon Katz, New York City (Karen E. Wagner, Davis Polk & Wardwell, New York City, of counsel; Levin & Weintraub & Crames, New York City, of counsel), for appellees LTV Steel Co., Inc. and Tuscaloosa Energy Corp.

Before CARDAMONE and MAHONEY, Circuit Judges, and POLLACK, District Judge.*

CARDAMONE, Circuit Judge:

This appeal arises out of a sale of the assets of a coal mine by appellees, LTV Steel Company, Inc. (LTV Steel) and Tuscaloosa Energy Corporation (Tuscaloosa or employer), its wholly-owned subsidiary, during the course of their reorganization as debtors under Chapter 11 of the Bankruptcy Code. Its resolution depends upon what is meant by the word "operations." That word is used in Article I of the National Bituminous Coal Wage Agreement of 1984 (Coal Wage Agreement or Agreement), to which appellees and appellant United Mine Workers of America (union) were signatories, and which in pertinent part provides:

> This Agreement shall be binding upon all signatories hereto, ... and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that *its operations* covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. (emphasis added).

---

* Hon. Milton Pollack, United States District Court Judge, Southern District of New York, sitting by designation.

The single question presented is whether the phrase "its operations" covers a mine closed in good faith and sold by a seller that retains no financial interest in any potential future mining activity at the site, so that the purchaser of the mine succeeds to the seller's obligation under the Agreement. To extract its meaning, like "winning" the coal, requires some effort and analysis, to which we now set ourselves.

## FACTS

LTV Steel and Tuscaloosa are both wholly-owned subsidiaries of LTV Corporation. LTV Steel is a fully-integrated steel producer and one of the largest steel producers in the United States. Among its properties is Republic Kentucky Mine, a coal mine located on 3,000 acres in Pike County, Kentucky, with proven coal reserves of approximately 5.5 million tons. Tuscaloosa is the operating company engaged in the production of coal. It conducted drift mining operations at the Republic Kentucky Mine, producing and selling high volatile metallurgical coal to LTV Steel for use in its coke-making operations. Beginning in 1980 coal was in oversupply in the market, and since that time the cost of producing a ton of coal at the mine has substantially exceeded its market price. By 1986 coal cost $49.65 per ton to produce and the average market price was only $31.00 per ton—an $18.65 per ton shortfall. As a result, in April of that year Republic Kentucky Mine was idled because it could not be operated profitably. Tuscaloosa's mine workers were laid off, and its mining equipment was withdrawn. Following closure, Tuscaloosa was obliged to seal the mine entrances, raze buildings, reclaim refuse piles and complete grading of the property. These closure obligations were estimated to cost $3.7 million and to require two years to complete. Subsequent to idling the mine, production costs and market prices have remained substantially the same as they were in 1986.

The former coal miner employees of Republic Kentucky Mine are members of and represented by the United Mine Workers, an unincorporated labor association. The union is a party to the Coal Wage Agreement with the Bituminous Coal Operator's Association, a multiemployer bargaining unit. Tuscaloosa also is a party to the Agreement, and its obligations to its hourly employees were governed by the Agreement at the time the mine shut down. The employer and union have been parties to successive collective bargaining agreements since 1974. On November 20, 1987 the employer notified the union that it was going out of the coal mining business and did not intend to enter into a new collective bargaining agreement. The Coal Wage Agreement, the terms of which are the subject of this appeal, expired on January 31, 1988.

The LTV Corporation and 66 of its subsidiaries, including LTV Steel and Tuscaloosa, filed petitions in the United States Bankruptcy Court for the Southern District of New York (Lifland, B.J.) for reorganization under Chapter 11 of the Bankruptcy Code on July 17, 1986. In October 1988 LTV Steel and Tuscaloosa entered into an agreement to sell the mine assets at Republic Kentucky Mine to Elkhorn Development Corp. (Elkhorn) for $5.1 million plus Elkhorn's assumption of the expenses of closing the mine. LTV Steel and Tuscaloosa applied several months later to the bankruptcy court for an order approving the sale. Because the acquisition agreement required Tuscaloosa to obtain either a release from the union or a final, nonappealable judgment by a court of competent jurisdiction declaring that Tuscaloosa had no further obligation under Article I of the subject Agreement, Tuscaloosa sought the requisite declaration from the bankruptcy court.

The union obtained a stay enjoining the employer from seeking such a declaration, alleging that the matter was within the exclusive jurisdiction of the National Labor Relations Board pursuant to the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1982), and that the employer still had obligations under Article I of the Coal Wage Agreement. The district court judge vacated the stay on January 11, 1989 ruling that the issue raised was not one of federal labor law but simply one of contract inter-

pretation. *In re Chateaugay Corp.*, 89 Civ. 0089 (S.D.N.Y. Jan. 11, 1989) (endorsed memorandum).

At a bankruptcy court hearing and auction on January 12, 1989 Jenkins Letcher Coal Corporation outbid Elkhorn for the mine assets with a bid of $6.3 million, and it assumed Tuscaloosa's closure obligations. The union again objected to the sale insofar as Tuscaloosa sought an order declaring it free from its obligations under the Coal Wage Agreement. In an order dated January 12, 1989, Bankruptcy Judge Lifland ruled that no obligation remained under Article I. He reasoned that the sale of a mine which had been idled for business reasons and without any showing of bad faith was not the sale of its "operations" within the meaning of Article I. The union appealed to the United States District Court for the Southern District of New York (Wood, J.), which on May 30, 1989 affirmed the bankruptcy court's order for the reasons stated by the bankruptcy court. *In Re Chateaugay Corp.*, 89 Civ. 1377 (S.D.N.Y. May 25, 1989). This appeal followed.

### DISCUSSION

The United Mine Workers argues that the bankruptcy and district courts erred in interpreting the term operations in the Agreement as referring only to mines that are active. First, they assert that since the word operations is used throughout the Agreement to refer to both open and closed mines, it should not be construed in Article I to apply only to open mines. The union further contends that the term was used in order to broaden the scope of the collective bargaining agreement, not to restrict its application solely to active facilities, and asserts that operations was intended to be viewed as a broader concept than "mines," so that facilities such as coal treatment plants would also be covered under the Agreement.

We agree that operations may be interpreted in some of the Agreement provisions to refer to closed mines; yet, other provisions employ the same term in contexts where it can only mean active operations. Thus, when discussing recall of an employee idled by a reduction in force, Article XVII, Section (9) provides that, for such an employee, securing intermittent employment "when no work is available at the operation" will not jeopardize his seniority rights. Operation in this context contemplates a mine, at least in part, idled. But Section (9) goes on to state that an out of work employee "who secures regular employment at another operation" and does not return sacrifices his seniority rights. Plainly, the latter use of operation in Section (9) refers to an active, working facility. Hence, examining the word in its context throughout the Agreement does little, if anything, to clear up whatever ambiguity exists in Article I's successorship clause.

The United Mine Workers next urges that the history and purpose of the successorship clause demonstrates its broad scope and suggests that operations includes closed mines. The clause was drafted in response to *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). In *Howard Johnson*, the Supreme Court held a "passive" successorship clause in a collective bargaining agreement that purported to bind employers and their "successors" to arbitration was not enforceable against a purchaser, absent an express assumption of the obligation. *Id.* at 251, 264, 94 S.Ct. at 2237, 2244. Article I of the subject Agreement contains such a "passive" clause. It states that "[t]his Agreement shall be binding on all signatories hereto, ... and their successors and assigns." The union presented evidence that the language regarding transfer of operations in the successorship clause was drafted to ensure that successorship rights would be enforceable in the wake of *Howard Johnson*, and argues that because the second sentence of that clause—the one that contains the term operations—was included in the Agreement to effectuate the first sentence, it cannot logically be interpreted more narrowly. Because the first or successorship sentence did not refer to operations, it is intended, the union asserts, to apply to all aspects of the contract—to closed as well as to open mines.

■ The intended meaning of the word "operations" in the second sentence is unclear. Courts attempting to interpret an ambiguous provision in a collective bargaining agreement may examine the purpose of the contract and the circumstances surrounding the negotiations leading to the execution of the contract. *See United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *Communications Workers of Am. v. Pacific Northwest Bell Tel. Co.,* 337 F.2d 455, 459 (9th Cir.1964). Plainly, the intent of the successorship clause is to assure employees "that the fruits of collective bargaining would survive a change in ownership." *See Lone Star Steel Co. v. NLRB,* 639 F.2d 545, 556 (10th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981).

Although interpretation of operations in Article I of the Coal Wage Agreement is one of first impression in this Circuit, district courts in other circuits and arbitration decisions have endeavored to construe the term. The bankruptcy court relied on two district court cases, *District 6, UMWA v. North American Coal Corporation,* No. C–2–79–242 (S.D. Ohio 1980), and *UMWA v. U.S. Steel Mining Co.,* 636 F.Supp. 151 (D. Utah 1986) in reaching its decision. *North American Coal* held that the sale of a coal tipple and appurtenant land of a mine that had been closed for 14 months was not a sale of its operations under the 1978 National Bituminous Coal Wage Agreement. *U.S. Steel* also held that the sale of a closed and abandoned mine did not constitute the sale of an operation under Article I. The court stated "a mining 'operation,' for purposes of Article I of the 1984 [Agreement], refers to a mine site or facility where active coal mining operations are being conducted" and that "a mine that has ceased to function as an active coal mine is not an 'operation,' assuming the mine was closed in good faith." 636 F.Supp. at 153–54.

■ The union believes that those cases were wrongly decided. It cites *UMWA v. Eastover Mining Co.,* 603 F.Supp. 1038 (W.D.Va.1985), and several arbitration decisions that it contends support its position. Although *Eastover* held that the sale of a closed mine was subject to the successorship provisions of the 1981 Coal Wage Agreement, that case is distinguishable from the instant case. In *Eastover,* the court explicitly found that the mine was closed in order to circumvent the collective bargaining agreement. The buyer in that case—upon advice of a management consulting firm—requested that the seller close the mine and terminate all employees 45 days prior to the closing of the sale. The buyer waited more than one month after the closure of the mine, purchased the mine, and then kept the mine idle until the collective bargaining agreement had expired. *Id.* at 1040–41. Obviously, when a mine is closed in an attempt to defeat a negotiated labor agreement, no weight should be given to the fact that the mine was closed prior to the sale. *U.S. Steel,* 636 F.Supp. at 154. No proof of that sort is present in the instant case. There are no allegations of bad faith. Here market conditions forced the shutdown of Republic Kentucky Mine and continue to make a drift mining operation at the present site economically unfeasible.

Nor is this a case in which the former operator retains some financial interest in the mine, benefiting indirectly from future mining activity at the site. Hence, arbitration decisions enforcing a successorship clause against a purchaser of a previously closed mine based on some "linkage" between the former operator and the successor are distinguishable from the present circumstances. *See Bethenergy Mines, Inc.,* No. 84–17–87–741 (July 28, 1987) (Lieberman, Arb.) (sublease arrangement provides lessee obligated to pay royalty to lessor for each ton of coal mined); *Standard Pocahontas Coal Corp.,* No. 78–16 (Sept. 21, 1979) (Arb.Rev.Bd., UMWA–BCOA) (former operator closed down operations and later contracted, via a mining service contract, for another operator to mine and deliver coal from the site to former operator).

The union points out that *Bethenergy* rejected *U.S. Steel's* definition of operations as excluding a closed mine, believing

it contrary to the history, practice and interpretation of the Coal Wage Agreement. *Bethenergy* is distinguishable because not only did it involve a continuing financial interest on the part of the former operator, but also the workers entered and began mining coal in an existing mine that had been abandoned but not closed by the first operator. Although mining equipment, including ventilating fans and conveyors, had to be installed, the employees "were dealing with a structure which had been created by prior mining which involved pillars, chambers, tunnels, roofs as well as entries, ventilation shafts and so forth." *See Bethenergy*, slip op. at 22; *see also Standard Pocahontas*, slip op. at 11 (successor continued mining coal at the same location and in the same manner as the previous operator).

In contrast to those arbitration results, this case does not involve a mine that has been temporarily closed; one that is subject to possible recall of idled workers to the same job site. The Republic Kentucky Mine has been permanently shut down and it is highly unlikely that the operation previously conducted there will be resumed. The market conditions that make it unprofitable for Tuscaloosa to conduct its drift mining operation apply equally to the purchaser. Subsequent mining activity therefore will have to be an entirely different operation, such as open pit mining. And, because the equipment required is intimately connected with the method of extraction, different equipment will be needed and the actual mining site would be at a different location on the 3,000 acre property. Any subsequent operation would therefore be completely distinct from Tuscaloosa's operation that worked the mine by underground methods through shafts and drifts.

If the intended purpose of the successorship clause has been frustrated, it is due not to the trial court's construction of the Agreement but to market realities governing the production of coal. We believe the meaning of the word "operations" should cover those methods of coal mining, production, preparation, transportation and other ancillary activities in which the union and Tuscaloosa were engaged during the effective term of the Agreement between them. In this case, none of those methods or activities were engaged in after the mine was idled over three years ago in 1986. As a consequence, the benefits of Article I, such as recall and seniority rights to the drift mining operation, did not survive the permanent shutdown of the mine, and no obligation remains for the purchaser to assume.

## CONCLUSION

The term "operations" within the successorship clause of Article I of the Coal Wage Agreement does not apply to the sale of a mine that has been permanently closed in good faith by a seller that retains no financial interest in any potential future mining activity at the site, and there is no evidence that the same operations, as when the Agreement was executed, could reasonably be contemplated or conducted.

Accordingly, the order of the district court is affirmed.