**PLUMBERS, PIPEFITTERS AND APPRENTICES LOCAL UNION NO. 112 PENSION, HEALTH AND EDUCATIONAL AND APPRENTICESHIP PLANS, by George FISH, as Fund Administrator, and Local Union No. 112 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, by Wayne Howard, as Business Manager; Plaintiffs,**

v.

**MAURO'S PLUMBING, HEATING AND FIRE SUPPRESSION INC., and Northeast Mechanical of N.Y., Inc., Defendants.**

No. 97–CV–155.

United States District Court, N.D. New York.

Feb. 10, 2000.

Blitman & King, LLP, Syracuse, NY, Jennifer A. Clark, Jodi P. Goldman, of counsel, for plaintiffs.

Hinman, Howard & Kattell, LLP, Binghamton, NY, Ronald L. Greene, of counsel, for defendants.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

Plaintiffs bring this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and the Labor–Management Relations Act of 1947, as amended ("Taft–Hartley Act"), 29 U.S.C. § 185(a) to recover benefit contributions allegedly owed by Defendants Mauro's Plumbing Heating and Fire Suppression, Inc. ("Mauro's") and Northeast Mechanical of N.Y., Inc. ("Northeast"). Presently before the Court is Plaintiffs' motion for summary judgment pursuant to FED. R.CIV.P. 56 seeking a judgment that Northeast is the alter ego and/or successor of Mauro's and that Mauro's and Northeast are liable for delinquent fringe benefit contributions, deductions, interest, and liquidated damages totaling $250,657.38, pursuant to ERISA, 29 U.S.C. § 1132(g)(2), for the period of May 3, 1996 to March 31, 1998 and an amount as yet to be determined for the period April 1, 1998 to the present. Plaintiffs also seek $34,979.76 in attorneys' fees and costs and a permanent injunction directing Defendants to comply with the terms of the collective bargaining agreement.

## I. Background

### A. Facts

### 1. The Collective Bargaining Agreement

The Plumbers, Pipefitters and Apprentices Local No. 112 Pension, Health and Educational and Apprenticeship Funds (the "Funds") were established pursuant to Restated Agreements and Declarations of Trust. The Funds are multi-employer plans and employee benefit plans as defined by ERISA, 29 U.S.C. §§ 1002(3) and (37).

On March 13, 1996, Mauro's entered into a collective bargaining agreement between the Broome County, New York Association of Plumbing, Heating and Cooling Contractors, Inc. and Local Union No. 112 of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (the "Union") (the "Agreement" or "CBA"). The CBA requires, among other things, that Mauro's report to the Funds and Union the number of hours worked by covered employees; remit certain contributions to the Funds for various employee benefits; and remit deductions to the Union for vacation, dues and contributions to the Industry Improvement and Industry Advancement Plans (the "IAP").[1] The CBA also states that by signing the Agreement, Mauro's agrees to be bound "to the terms of the Trust Agreements under which the Health Fund, Pension Fund, and Education and Apprenticeship Fund are operating." *See* CBA Art. 11(H).

In the event that Mauro's fails to make the required contributions, the CBA provides that the Funds can recover the delinquent contributions and interest at the rate of two percent (2%) per month; plus the greater of interest on the unpaid and untimely paid contributions or liquidated damages equal to twenty percent (20%) of the amount found to be delinquent; plus interest on the unpaid and untimely deduction and IAP monies, at the rate of nine

---

1. Article 11(B) of the CBA provides:

 The employer agrees to pay $3.30 per hour worked by all plumber and/or pipefitter foremen, journeymen and apprentices covered by this Agreement to the trustees of the Plumbers, Pipefitters and Apprentices Local No. 112 Health Fund; $2.50 per hour to the trustees of the Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund; and $.31 per hour to the trustees of the Plumbers, Pipefitters and Apprentices Local Union No. 112 Educational and Apprenticeship Fund; $.15 per hour to the trustees of the Plumbers, Pipefitters and Apprentices Local 112 Industry Improvement Fund.

percent (9%) per annum; plus auditing fees; plus attorneys' and paralegal fees and costs arising out of the collection of the delinquent contributions. *See* CBA Art. 11, ERISA, 29 U.S.C. § 1132(g)(2), Pl. 7.1(a)(3) Statement ¶ 8.

## 2. The Companies

In this action, Plaintiffs seek to recover allegedly delinquent contributions from Mauro's, a signatory to the CBA, and Northeast, a non-signatory. Plaintiffs assert that Northeast is the alter ego and/or successor of Mauro's and, thus, is bound to the CBA and jointly and severally liable for contributions allegedly owed by Mauro's. Because the parties dispute the alter ego and/or successor issue, a detailed analysis of the formation, business operations, and interrelationship of the two companies is warranted.

Mauro's was incorporated on October 2, 1989. It had an office located at Watson Boulevard, Endicott New York and subsequently moved to 5 Endicott Avenue, Johnson City, New York. Mauro's performed primarily residential, light commercial, and prevailing wage work in the plumbing industry. *See* P. Mauro Aff. ¶ 3.[2] Philip and Albert Mauro held all of Mauro's shares and the offices of President and Secretary/Treasurer, respectively.

In September of 1996 Philip and Albert Mauro established a second corporation, Northeast. On September 24, 1996, the Mauros incorporated Northeast under the laws of New York. Philip and Albert Mauro, the President and Secretary/Treasurer of Northeast, respectively, hold all of its shares. The Mauros established Northeast as a non-Union corporation to perform residential and light commercial work, maintenance, repair, and service work on non-Union, non-prevailing wage jobs. *See* P. Mauro Aff. ¶ 21. Northeast's original office was located at 404 W. Main Street, Endicott, New York and its phone number was (607) 748–1239. *See* P. Mauro Aff. ¶¶ 19, 20. This number "rang through" to Mauro's office at 5 Endicott Avenue. *See* P. Mauro Dep. at p. 131.

In December 1996, Mauro's ceased all operations and was no longer a viable business. *See* P. Mauro Aff. ¶ 18. As early as January 2, 1997, Northeast began operating at Mauro's 5 Endicott Avenue address and took over Mauro's (607) 729–2521 telephone line. *See* Clark Aff.Ex. N and Ex. J at p. 11–12.

Northeast employed the following individuals who Mauro's previously employed: Rebecca Anthony, Thomas Brown, Christopher Corbett, Kenneth Fontana, Russell Garruto, Robert Handzel, John Hardy, Mark Klossner, Stan Krizinofski, Mark Lindsay, Joseph Lindsey, Albert Mauro, Philip Mauro, Tim Micalizzi, Greg Misner, Michael Morrelino, David Rosenbloom, Carmen Salva, John Sullivan, Grace Tkach, Thomas Vergona, Carlton Williams, and William Yurko.[3] These employees performed the same type of work at Northeast as they did at Mauro's. Philip

---

**2.** "P. Mauro" refers to Philip Mauro.

**3.** Defendants prepared this list in response to Plaintiffs' second request for production of documents dated September 4, 1998. *See* Clark Aff. ¶ 30, Ex. Q. Defendants' motion papers, however, suggest that Northeast and Mauro's had fewer common employees than those provided in discovery. For the most part, the differences are minor and Plaintiffs justifiably relied on the list produced by Defendants. However, the continued employment of Micalizzi, Lindsay, and Handzel at Northeast, which Defendants dispute, is significant. Defendants allege that although Lindsay, Handzel, and Micalizzi received W–2 Wage Statements from Northeast, it did not actually employ them. Instead, because Binghamton Savings Bank seized Mauro's operating bank accounts, Northeast paid these employees for work previously performed for Mauro's. The record shows, however, that these employees performed work on the Oneonta project in 1997, after Mauro's had ceased doing business and that Mauro's bank accounts remained active until March 1997. *See* Clark Reply Aff. ¶ 20, Ex. D. Accordingly, the Court finds that Handzel, Micalizzi, and Lindsay should be considered employees of Northeast for purposes of the instant motion.

and Albert Mauro retained similar responsibilities at Northeast.

During early 1997 the business operations of Northeast overlapped with those of the defunct Mauro's. In January 1997, Grace Tkach continued to perform duties on behalf of Mauro's while receiving compensation from Northeast. *See* Tkach Dep. at pp. 29–30. In December of 1996 or January of 1997 Northeast completed work on Mauro's Stamford Village Apartments project, *see* P. Mauro Dep. at pp. 85–86, without entering into a new contract with Court Street Companies, the project's manager. Additionally, former employees of Mauro's testified that, while receiving compensation from Northeast, they worked on Mauro's Oneonta School District Project. *See* Micalizzi Aff. ¶¶ 4, 8; Handzel Aff. ¶ 7. Although Mauro's ceased doing business in December of 1996, it submitted a remittance report to the Union for the period of January 1 to 31, 1997. *See* McCarthy Aff.Ex. A. This report listed hours for Handzel and Micalizzi. Northeast, rather than Mauro's, paid Micalizzi and Handzel for work completed during the reported period. Mauro's did not notify either employee of the change in company name. In January and February of 1997, Handzel received paychecks that listed no company name and only learned that Northeast employed him when he received his 1997 W–2 Wage Statement. *See* Handzel Aff. ¶¶ 5, 8. Micalizzi also received paychecks without a company name and learned Northeast employed him when he received his 1997 W–2 Wage Statement. *See* Micalizzi Aff. ¶¶ 3, 9. As early as November 1996, employees who believed Mauro's employed them received paychecks listing Northeast as their employer. *See* Lindsay Aff. ¶ 7.

From January 1997 through July 1997 Northeast paid for Blue Cross/ Blue Shield health insurance coverage for its employees pursuant to a policy that listed the employer as Mauro's. Moreover, during December of 1996 and January of 1997 Northeast and Mauro's made several payments to each other. *See* Clark Aff. ¶¶ 46–50 (citing, *inter alia*, Chase Manhattan Check Nos. 2100, 2105 and Binghamton Savings Bank Check Nos. 1582 and 1594). During this same period, Northeast and Mauro's made payments on behalf of one another to suppliers and banking institutions. *See* Clark Aff. ¶¶ 51–54 (citing, *inter alia*, Binghamton Savings Bank Check No. 1552 and Chase Manhattan Bank Check Nos. 2697 and 2795).

Northeast utilizes the same attorneys, Hinman, Howard & Kattell, and accountant, Ken Lass, CPA, as Mauro's.

Prior to the repossession of Mauro's tools and equipment in October of 1997, *see* P. Mauro Aff. ¶ 16, Ex. B, Northeast utilized this equipment. *See, e.g.,* Lindsay Aff. ¶ 9. Northeast also utilized a vehicle previously registered to Mauro's. Northeast assumed the registration, however, no money changed hands. *See* P. Mauro Dep. at p. 123. Moreover, Northeast used the same office equipment as Mauro's had.[4] *See* Tkach Dep. at p. 19.

Currently, there is a twenty percent (20%) overlap between the former customer list of Mauro's and the customer list of Northeast. Northeast uses virtually identical suppliers and service providers, however, Northeast filled out new credit applications and did not assume Mauro's credit lines with common suppliers.

### B. Procedural History

On February 6, 1997, Plaintiffs commenced this action. On August 17, 1998, Plaintiffs filed a Stipulation and Order joining Northeast as a Defendant and amending their Complaint. In October

---

**4.** In the Fall of 1996 Mauro's Realty LLC entered into an agreement to purchase office equipment and tools from Marine Midland Bank. Marine Midland Bank acquired the tools through repossession proceedings against Ainslie Plumbing, Inc. Northeast rented this equipment from Mauro's Realty LLC. *See* P. Mauro Aff. ¶¶ 23–25. Prior to December of 1996, Mauro's used this equipment. *See* Tkach dep. at p. 21.

and November of 1998 the parties engaged in discovery. On April 6, 1999, Plaintiffs filed a motion for summary judgment. On May 12, 1999, pursuant to the parties' request, the Court held this motion in abeyance for thirty days to facilitate settlement. On June 11, 1999, the Court granted the parties' second request to hold this motion in abeyance for an additional sixty days to allow the parties to finalize settlement. On August 9, 1999, the parties advised the Court that the case had not settled.

Presently before the Court is Plaintiffs' motion for summary judgment pursuant to FED.R.CIV.P. 56 seeking a judgment that Northeast is the alter ego and/or successor of Mauro's and that Mauro's and Northeast are liable for delinquent fringe benefit contributions, deductions, interest, and liquidated damages in the amount of $250,-657.38 for the period of May 3, 1996 to March 31, 1998 and an amount as yet to be determined for the period April 1, 1998 to the present. Plaintiffs also seek $34,-979.76 in attorneys' fees and costs and a permanent injunction directing Defendants to comply with the terms of the CBA and prohibiting Defendants from incurring further delinquencies.

## II. Discussion

### A. Summary Judgment Standard

The standard for summary judgment is well-settled and need not be restated here. This Court has set forth the appropriate standard to be applied in numerous published decisions, *see, e.g., Roman v. Cornell Univ.*, 53 F.Supp.2d 223, 232–33 (N.D.N.Y.1999); *Phipps v. New York State Dep't of Labor*, 53 F.Supp.2d 551 (N.D.N.Y.1999), and will apply the same standards discussed in these cases to Plaintiffs' motion for summary judgment.

### B. Is Northeast the alter ego of Mauro's?

Plaintiffs contend that because Northeast is the alter ego of Mauro's, Northeast is bound to the CBA and obligated to remit reports, fringe benefits, contributions and deductions to the Funds and Union for all hours related to plumbing performed from May 1996 to date. Defendants respond that Northeast is a separate business entity and is not bound to the CBA.

 "The alter ego doctrine is designed to defeat attempts to avoid a company's union obligations through a sham transaction or technical change in operations." *See Local One, Amalgamated Lithographers v. Stearns & Beale, Inc.*, 812 F.2d 763, 772 (2d Cir.1987). The key factors to consider when making an alter ego determination are whether the enterprises under review have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir.1996) (citing *Truck Drivers Local No. 807 v. Reg'l Import & Export Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir.1991)); *see also Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir.1984). "If two companies are deemed alter egos of each other, then each is bound by the collective bargaining agreements signed by the other," *Lihli*, 80 F.3d at 748 (citing *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974)), and "thereby obligated to honor the pension contribution terms" of the agreement. *Sloan*, 902 F.2d at 596. Although anti-union animus is relevant to the alter ego determination, the Second Circuit has stated that while the presence of such animus may be a sufficient basis for imposing alter ego status, its absence is not dispositive. *See Goodman Piping Prods.*, 741 F.2d at 11.

 Applying the factors outlined above, the Court finds that Northeast is Mauro's alter ego.

First, there is continuity of ownership and management. Both Mauro's and Northeast are owned by Philip and Albert

Mauro. Similarly, the Mauro brothers hold the office of President and Secretary/Treasurer of both corporations and each hold the same management responsibilities at each company. Their responsibilities include, *inter alia,* bidding on projects, supervising projects, and hiring and firing employees. Additionally, the companies employed many of the same employees. The fact that Northeast employed different foremen than Mauro's and, thus, on the job supervision changed slightly, is insufficient to create a genuine issue of material fact as to whether Northeast is Mauro's alter ego. *See, e.g., A & P Brush Mfg. Corp. v. NLRB,* 140 F.3d 216, 220 (finding that companies owned by different family members had "substantially identical ownership"); *Puccio v. L.M.G. Air Corp. & All Pro Air Delivery, Inc.,* 1998 WL 887008, at *6 (E.D.N.Y. Dec.8, 1998) (finding "significant managerial overlap" despite some management changes).

Second, Mauro's and Northeast have similar business purposes. Both companies perform light commercial, commercial, and residential plumbing work. Although the Defendants argue that Mauro's focused its business on commercial plumbing and prevailing wage work whereas Northeast focuses on light commercial and non-prevailing wage work, Defendants failed to offer a workable distinction between "light commercial" and commercial work. The relevant distinctions appear to be whether a project is or is not prevailing wage and is or is not Union. Moreover, in its first few months of operation, Northeast worked on at least two of Mauro's projects, at least one of which was Union.[5] Significantly, Tkach submitted a remittance report to the Union for hours worked by Handzel and Micalizzi in January of 1997. Handzel and Micalizzi are Union members and Northeast paid them for work done in 1997—after Mauro's ceased operations. Moreover, employees of Northeast testi-

fied that Northeast performed the same kind of work as Mauro's. *See* Tkach Dep. at p. 80. The companies also operated in the same geographic area. *See* Howard Aff. ¶ 19.

Third, the operations of the Mauro's and Northeast overlapped. After Mauro's ceased operations in December 1996, Northeast took over its offices and phone number. Although Northeast took over the premises in January of 1997, it did not formally lease the property from Mauro's Realty LLC until May of 1997. During the short simultaneous period of existence, Northeast maintained a separate office and phone number, however, the phone number "rang through" to the offices of Mauro's.

The financial overlap of Mauro's and Northeast further demonstrates their similar operations. During 1996 and 1997, the companies made payments to one another and made payments on behalf of one another. Mauro's maintained insurance policies, paid for by Northeast, after it ceased operations. These policies covered Northeast's employees. Northeast took over the use of a vehicle formerly registered to Mauro's without making any payment to Mauro's and employees of Northeast continued to do work for Mauro's while compensated by Northeast. These facts demonstrate that, at least at the outset, the operations of Northeast and Mauro's overlapped substantially. This supports the conclusion that Northeast is Mauro's alter ego. *See, e.g., Sloan,* 902 F.2d at 597.

Fourth, at the outset, Northeast used the same office and plumbing equipment as Mauro's. Although Defendants argue that Northeast could not have used Mauro's plumbing equipment because M & T Bank repossessed the equipment, the record shows that M & T Bank did not repossess the plumbing equipment until October of 1997. *See* P. Mauro Aff. ¶ 16, Ex. B. Employees of Northeast testified that in

---

5. Northeast completed the Stamford Village Project and worked on the Oneonta (Union) project in January and February of 1997.

January and February of 1997, they used Mauro's tools while working for Northeast. *See, e.g.,* Micalizzi Aff. ¶ 12; Lindsay Aff. ¶ 9. The fact that M & T Bank eventually repossessed Mauro's tools and, thus, Northeast stopped using this equipment does not vitiate a finding that the two companies used the same plumbing equipment. The two companies also used the same office equipment. When Northeast took over Mauro's former offices at 5 Endicott Avenue the office staff used the same office equipment as they had while they worked for Mauro's.

Fifth, the record shows that Northeast and Mauro's shared customers. Although at this point there is only a twenty percent (20%) overlap between the companies customer lists, two of Northeast's first projects involved customers and projects that it inherited from Mauro's. Moreover, given the quantum of evidence of overlap between the two companies, the lack of substantial current overlap in customer lists is not dispositive. *See Lihli Fashions Corp.,* 80 F.3d at 747 (stating that no one factor is controlling and every factor need not be present to determine that a company is an alter ego).

Finally, there is evidence in the record which suggests that the Mauro's had antiunion animus insofar as they specifically established Northeast as a non-Union entity. *See, e.g.,* P. Mauro Dep. at p. 56. Additionally, there is evidence demonstrating that Northeast is a disguised continuance of Mauro's. For example, the Mauro's did not inform certain employees that they had become employed by Northeast. These employees learned of their new employer when, in early 1998, they received their 1997 W–2 Wage Statements. *See* Micalizzi Aff. ¶¶ 4, 5, 11; Handzel Aff. ¶¶ 3–5. This further supports the finding

that Northeast is Mauro's alter ego. *See, e.g., A & P Brush Mfg. Corp.,* 140 F.3d at 220.

The fact that Mauro's ceased doing business due to financial difficulty, *see* P. Mauro Dep. at p. 12, does not prevent this Court from finding that Northeast is its alter ego. *See Mason Tenders Dist. Council Welfare Fund v. ITRI Brick and Concrete Corp.,* 1997 WL 678164, at *4 n. 5 (S.D.N.Y. Oct.31, 1997) ("Even assuming that Brick ceased operations and/or was declared a bankrupt by 1993.... If Brick and Masonry are found to be either a single employer or alter egos, the 1993 CBA survives, and the Funds would be seeking contributions owed under the CBA, not post contract contributions."). In fact, Philip Mauro testified that Mauro's believed they would save money by joining the Union but in reality they lost money. *See id.* at 68–69. This testimony supports the conclusion that the Mauros established Northeast to circumvent the financial burdens imposed by the CBA.

After examining the documentation submitted by the parties in connection with the instant motion, the Court finds that there is no genuine issue of material fact regarding the alter ego question. Accordingly, the Court finds that a rational trier of fact could only conclude that Northeast is Mauro's alter ego and, thus, Northeast is bound by the CBA.[6]

## C. Interpretation of the CBA

In this case, Plaintiffs assert that for the period of May 3, 1996 to March 31, 1998 Defendants failed to make contributions required by the CBA and Trust Agreement and, thus, owe $250,657.38 in delinquent contributions, deductions, interest, and liquidated damages for this period.[7]

---

6. Because the Court determined that Northeast is the alter ego of Mauro's and Mauro's conceded that it is liable for contributions for the Union work it performed, at this juncture it is unnecessary to determine whether Northeast should be held liable for Mauro's delin-

quencies on a successorship theory of liability.

7. This figure includes $45,158.31 for the period of May 3, 1996 through January 31, 1997 and $205,499.07 for the period of January 1, 1997 through March 31, 1998. The total con-

An auditor calculated these figures based on a review of the payroll records of Northeast and Mauro's. The calculation includes contributions on behalf of all employees performing bargaining unit work. *See* McCarthy Aff. ¶ 3. The auditor considered "all plumbing, heating, cooling, pipefitting, piping and sprinkler work on all residential and commercial projects" to be bargaining work. *Id.* ¶ 4.

Defendants dispute Plaintiffs' calculations, insofar as they dispute the interpretation of "covered employees" and "bargaining work" and claim that the CBA is at least ambiguous on these points. Defendants contend, therefore, that summary judgment is inappropriate because a genuine issue of material fact exists regarding whether the CBA obligated Defendants to contribute to the Funds on behalf of their non-Union Member employees or for hours worked on residential and service and repair projects.

 It is firmly established that the determination of whether a contract contains ambiguous language is a question of law. *See, e.g., Haber v. St. Paul Guardian Ins. Co.,* 137 F.3d 691, 695 (2d Cir.1998). A contract provision is ambiguous when "it is reasonably susceptible to more than one reading." *Id.* If the contract language is clear, summary judgment is appropriate. *See Healy v. Rich Prod. Corp.,* 981 F.2d 68, 72 (2d Cir.1992); *New York State Teamsters Council Health and Hosp. Fund v. Perfection Oil Co., Inc.,* 1998 WL 315096, at *3 (N.D.N.Y. June 11, 1998) (citing *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 230 (2d Cir.1995)); *see also D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N.A.,* 957 F.2d 196, 199 (5th Cir.1992). Conversely, if the contract language is ambiguous and extrinsic evidence creates a genuine issue of material fact, summary judgment is inappropriate. *See Shepley v. New Coleman Holdings, Inc.,* 174 F.3d 65, 72 n. 5 (2d Cir.), *cert. de-*

*nied,* —— U.S. ——, 120 S.Ct. 170, 145 L.Ed.2d 144 (1999); *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.,* 37 F.3d 55, 58 (2d Cir.1994).

 Extrinsic evidence can be used to interpret ambiguous collective bargaining agreements, *Am. Fed. of Grain Millers, AFL—CIO v. Int'l Multifoods Corp.,* 116 F.3d 976, 980 (2d Cir.1997) (citing *UMW v. LTV Steel Co. (In re Chateaugay Corp.),* 891 F.2d 1034, 1038 (2d Cir.1989)), however, "extrinsic evidence cannot alter the meaning of unambiguous terms." *Id.* (citing *Vulcan Arbor Hill Corp. v. Reich,* 81 F.3d 1110, 1117 (D.C.Cir.1996)). "In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. There may not be any genuine issue regarding the inferences to be drawn from the language. The inferences may not be reasonably susceptible to having more than one meaning ascribed to them." *Healy,* 981 F.2d at 72 (quotations and citations omitted).

### 1. Which Employees are covered?

Defendants first argue that Plaintiffs' damage calculations are incorrect because they took into account hours worked by all of Mauro's employees rather than only its Union employees. According to Defendants, at the time they signed the CBA, Union representatives agreed that they could retain five "non-Union" employees to work on "non-Union" projects. *See* P. Mauro Dep. at pp. 64–66. Plaintiffs deny that they agreed to this exception and assert that the Union bargaining representative told Mauro's representatives that all of its employees must either join the Union or leave Mauro's employment. Plaintiffs further assert that the five employees

sists of $154,716.19 in fringe benefit contributions and deductions, $49,089.74 in interest, and $46,851.45 in liquidated damages.

referenced by Defendants were apprentices (they were not qualified as journeyman) rather than "non-Union" employees. This extrinsic evidence is not relevant, however, unless the CBA is found to be ambiguous. *See, e.g., O'Neil,* 37 F.3d at 58.

In determining whether a collective bargaining agreement is ambiguous with respect to contributions due for non-Union employees, this Court previously followed the lead of the Sixth Circuit in *Teamster's Local 348 Health and Welfare Fund v. Kohn Beverage Co.,* 749 F.2d 315, 318 (6th Cir.1984) (en banc) ("*Kohn*"), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2024, 85 L.Ed.2d 305 (1985), which addressed an identical question of contract interpretation. *See Central Pension Fund of the Int'l Union of Operating Eng'rs and Participating Employers v. Murphy's Tire, Inc.,* 1998 WL 865594, at *5 (N.D.N.Y. Dec.9, 1998). In rejecting defendant's argument that the collective bargaining agreement and employee benefit plans obligated contributions for only union members, the *Kohn* court set forth several guiding factors. First, it explained that the "presence in the [collective bargaining agreement] of a recognition clause designating the union as the exclusive bargaining agent for all employees indicates that fringe benefit contributions are required for both union and non-union members." *Id.* Second, it noted that because the collective bargaining agreement defined employees by job classification, all employees within those job classifications must be covered by the collective bargaining agreement, regardless of union membership. *See id.* Third, it found that the absence of any language in the collective bargaining agreement distinguishing between union and non-union employees indicates that it covered all employees. *See id.* Fourth, it explained that union shop clauses, which require employees to maintain membership in the union, "have been construed to require only payment of union dues and not union membership." *Id.* The *Kohn* Court noted that to equate employees covered by the agreement with union members would render the union shop clause superfluous and, thus, found that the presence of a union shop clause suggested that the agreement covered all employees. *See id.* Accordingly, *Kohn* held that the district court erred in interpreting the contract as requiring contributions for only defendant's union member employees. *Id.* at 318–19.

Like *Kohn,* other courts have consistently construed collective bargaining agreements as unequivocally obligating an employer to contribute to an employee benefit plan for all its employees, irrespective of union membership. *See, e.g., Trustees of the B.A.C. Local 32 Ins. Fund v. Fantin Ent., Inc.,* 163 F.3d 965, 969 (6th Cir.1998) ("As a matter of law, collective bargaining agreements may require employers to contribute to funds for all employees, not just employees who are members of the union.") (internal citations omitted); *D.E.W.,* 957 F.2d at 201; *Trustees of Asbestos Workers Local Union No. 25 Ins. Trust Fund v. Metro Insulators, Inc.,* 902 F.2d 1569, 1990 WL 67403, at *5 (6th Cir.1990) (Table); *Clark v. Ryan,* 818 F.2d 1102, 1105 (4th Cir.1987); *Byrnes v. DeBolt Transfer, Inc.,* 741 F.2d 620, 624 (3d Cir. 1984); *Manning v. Wiscombe,* 498 F.2d 1311, 1312–13 (10th Cir.1974); *NYSA–ILA Med. and Clinical Servs. Fund v. Golten Marine Co., Inc.,* 1994 WL 800706, at *4 (S.D.N.Y. Dec.21, 1994); *Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.,* 1992 WL 175499, at *1 (N.D.Ill. July 20, 1992), *aff'd,* 69 F.3d 1312 (7th Cir.1995), *cert. denied,* 517 U.S. 1134, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996); *New York State Teamsters Council Health and Hosp. Fund v. City of Utica,* 643 F.Supp. 619, 621–22 (N.D.N.Y. 1986); *Central States, Southeast and Southwest Areas Pension Fund v. Capitol City Lumber Co.,* 627 F.Supp. 974, 980 (W.D.Mich.1985). "Employees covered by the trust agreements are ... defined by the nature of their work and not their union status." *Fantin Enter.,* 163 F.3d at 970 (internal citation omitted). This is

true even in cases where an employer had from the inception of the contract made contributions for only union employees. *See Clark*, 818 F.2d at 1105 (discussing *Manning v. Wiscombe*, 498 F.2d 1311 (10th Cir.1974)).

■ The CBA in this case is not substantively different from the one in *Kohn, Murphy's Tire*, and the cases cited above. First, Article 11 of the CBA requires signatories to make contributions to the Funds for all hours worked by "plumber and/or pipefitter foremen, journeymen and apprentices covered by this Agreement." [8] Second, the CBA contains a recognition clause designating the Union "as the collective bargaining agent for the employees affected by this agreement." CBA Art. 1(A). Third, although the CBA does not define employee, it refers to employees by job classifications. *See, e.g.,* CBA Art. 11. Fourth, the CBA does not distinguish between Union and non-Union employees. Further, "[t]he absence of any distinction in the agreements between union and non-union members can be easily explained: the law does not permit such a distinction.... An employer may not encourage or discourage union membership by means of discrimination." *Byrnes*, 741 F.2d at 623 (citing 29 U.S.C. § 158(a)(3)). Finally, the CBA contains a union shop clause. Article 1(B) states that all employees must "become and remain members in good standing of the order to continue in employment." Equating covered employees with Union members would render this clause meaningless. It is well-settled that, whenever possible, courts should interpret contracts to give meaning to all terms rather than adopt an interpretation that renders a provision superfluous or meaningless. *See, e.g., Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988).

■ In light of these factors, the Court finds that the CBA's language clearly and unambiguously obligates Defendants to make contributions to the Funds for all employees, including non-Union member employees, performing bargaining unit work. Further, because the contract is not reasonably susceptible to Defendants interpretation, Defendants cannot contradict its plain meaning with parol evidence of a different oral understanding, or thereby attempt to interject ambiguity in an otherwise unambiguous instrument. *See, e.g., Golten Marine Co.*, 1994 WL 800706, at *1 ("The rule against the admissibility of parol evidence is particularly important in the context of collective bargaining agreements.") (citations omitted). Accordingly, Mauro's and Northeast are liable to Plaintiffs for the unpaid contributions attributable to bargaining unit work performed by all of their employees.

## 2. What is bargaining work?

The parties also disagree as to which categories of work the CBA covers. Defendants allege that "the plain language of the CBA clearly limits the work it covers to construction related jobs, not general service and maintenance." Mem. of Law at 9. Thus, Defendants claim that the CBA does not cover residential work. Defendants further assert that the CBA limits bargaining work to installation-related plumbing work, with the limited exception of service and maintenance work on equipment that Union members originally installed. Plaintiffs, on the other hand, contend that bargaining unit work includes all plumbing and piping work within the Union's geographic jurisdiction.

As discussed above, when faced with a question of contract interpretation, the Court must first determine whether the contract contains ambiguous language.

---

**8.** The CBA in *Kohn* required the employer to make contributions on behalf of each "regular employee covered by this agreement." 749 F.2d at 318. There, the collective bargaining agreement defined "Employee" as "Driver– Salesmen, Special Drivers, Swing Drivers, Over–the–Road Drivers, Helpers and Warehousemen, Garage Mechanics and Garage Maintenance employees." *Id.*

The CBA does not define "bargaining work," however, it clearly contemplates work outside of installation. *See, e.g.,* Art. 16(D)(2) ("[T]he prefabrication of welded pipe formations, all lap-joint work and refacing of flanges may be performed at the site of the job or in the plant of the employer..."); Art. 16(H) ("The work to be performed in the shop and in the field shall include: unloading, handling, and erecting of material, installation of hangers and supports, making of all bends with a normal diameter of two inches or less. Cutting and threading of all pipe two. and one-half inches or over in diameter as covered by this agreement. The attaching of pipe fittings and valves, whether welded, screwed, or flanged."). Notably, the CBA does not reference or distinguish between residential, commercial, construction, light commercial, or prevailing rate work. Thus, although the contours of bargaining work are unclear, the CBA clearly and unambiguously covers more than installation and encompasses residential and commercial projects.

The partial ambiguity, however, does not bar summary judgment. *See Chock Full O'Nuts Corp. v. Tetley, Inc.,* 152 F.3d 202, 204 (2d Cir.1998). Summary judgment is appropriate if the moving party would prevail under any reasonable interpretation of the contract. *See id.* Ambiguity itself is insufficient to create a genuine issue of material fact and summary judgment is appropriate if the ambiguity coupled with the extrinsic evidence does not create a genuine issue of material of fact. *See Shepley,* 174 F.3d at 72 n. 5. Both the contractual ambiguity and the extrinsic evidence, however, must be construed in the manner most favorable to the non-moving party. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992).

The extrinsic evidence in this case indicates that the parties intended bargaining work to cover all plumbing work. Howard, the Union's Business manager, states that the CBA covers "[a]ll plumb-ing, pipefitting, and sprinkler work ... regardless of the size, nature, or character of the project." Howard Aff. ¶ 9. Philip Mauro, on the other hand, testifies that Mauro's believed that the CBA did not cover residential, repair or service work. P. Mauro Aff. ¶ 29. Mauro's practice, however, belies this interpretation. Tkach, the employee who filled out Mauro's remittance forms, testified that once an employee belonged to the Union she reported "any jobs he worked on" to the Union. Tkach Dep. at p. 70. Thus, instead of reporting only hours worked on installation in commercial projects, Mauro's reported hours for all commercial and residential work performed by Union employees. *Id.* at 72. Accordingly, the business practice of Mauro's indicates that they distinguished between Union and non-Union workers rather than Union and non-Union work. Combined with the language in the CBA which does not distinguish between residential and commercial work and clearly indicates that "bargaining work" is not limited to installation projects or the limited section of service work defined by Defendants, a rational finder of fact could not conclude that the CBA limits the definition of bargaining work to commercial installation projects. Neither the contractual ambiguity nor the extrinsic evidence give rise to a genuine issue of material fact precluding summary judgment. Accordingly, the Court finds that the CBA covers all plumbing, pipefitting, and sprinkler work regardless of the size of the project. Defendants are therefore responsible for contributions for all plumbing, heating, cooling, pipefitting and sprinkler work on all residential and commercial projects.

## III. Damages

### A. Contributions and Deductions

Plaintiffs seek to recover $250,657.38 in delinquent fringe benefit contributions, deductions, interest and liquidated damages for the period of May 3, 1996 through

March 31, 1998. This sum consists of $154,716.19 in fringe benefit contributions and deductions,[9] $49,089.74 in interest and $46,851.45 in liquidated damages. An auditor calculated these sums after reviewing Defendants' payroll records. *See* McCarthy Aff.

Defendants dispute the calculations insofar as the auditor included contributions for work and employees they believe the CBA does not cover. As discussed above, however, the Court finds that a rational finder of fact must conclude that Plaintiffs correctly interpreted the CBA to include all employees and all plumbing work. Defendants did not raise any further objections with respect to the auditor's report. Accordingly, Plaintiffs are awarded $250,657.38 in damages for the period of May 3, 1996 to March 31, 1998. Plaintiffs are also entitled to recover delinquent contributions, deductions, interest, and liquidated damages for the period of April 1, 1998 to May 1, 1999.[10] The amount owed should be determined by an auditor in accordance with the terms of the CBA.

### B. Attorneys' Fees

In accordance with the CBA, the Restated Agreements and Declarations of Trust, the Collections Policy and ERISA, 29 U.S.C. § 1132(g)(2), Defendants are liable for the reasonable attorneys' fees and costs incurred in collecting delinquent contributions and deductions.

Plaintiffs seek $34,979.76 in attorneys' fees and costs, paralegal fees, and auditing fees. In support of this application, Plaintiffs' attorneys submitted contemporaneous time records of work performed as required by the Second Circuit. *See, e.g., Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). The records sub- mitted specified "for each attorney, the date, the hours expended, and the nature of the work done." *Carey,* 711 F.2d at 1148. The Court independently reviewed these records and determined that the fee request is reasonable given the length and complexity of the litigation.

■ The Court will, however, reduce the requested fee to reflect the accepted hourly rates in the Northern District of New York. As this Court recently discussed in *TM Park Ave. Assocs. v. Pataki,* 44 F.Supp.2d 158, 167 (1999), the applicable hourly rate depends on an attorney's professional experience. Thus, as a general rule, attorneys with significant experience and numerous years of practice are entitled to reimbursement at the hourly rate of $175.00; attorneys with four or more years of experience at the hourly rate of $125.00; and newly-admitted attorneys at the rate of $100.00 per hour. *See TM Park Ave. Assocs.,* 44 F.Supp.2d at 167; *Carroll v. DeBuono,* 48 F.Supp.2d 191, 193–95 (N.D.N.Y.1999). *TM Park* awarded paralegal time at $50.00 per hour, in part because the parties provided no evidence to substantiate a higher rate. 44 F.Supp.2d at 167. Although this Court subsequently raised the paralegal rate to $65.00 per hour, *see Sheet Metal Div. of Capitol Dist. Sheet Metal, Roofing & Air Conditioning Contractors Assoc., Inc. v. Local Union 38 of the Sheet Metal Workers Int'l Assoc.,* 63 F.Supp.2d 211, 214 (N.D.N.Y.1999), the rate change took effect after Plaintiffs performed the work for which they seek reimbursement. Plaintiffs offered no documentation to support application of a higher rate. Accordingly, the Court will apply the rate submitted, which in all cases is less than $175.00, for the work of Attorney Clark; $125.00 an hour for the work of Attorney Goldman; and $50.00 an hour for the work of paralegals. The Court awards $26,907.30 in at-

---

**9.** The Court arrived at a different sum, $154,712.53, from the figures provided by the auditor. However, the difference of approximately $4.00 is immaterial and, thus, irrelevant for purposes of the damages award.

**10.** On or about January 19, 1999, Mauro's terminated the CBA. *See* Clark Aff. ¶ 25, Ex. F.

torneys' fees,[11] $1,837.90 in costs and disbursements, and $1,666.01 in auditing costs. *See* Clark Aff. ¶¶ 58–62, Ex. GG; McCarthy Aff. ¶ 21.

## C. Injunction

 Plaintiffs seek a permanent injunction directing Defendants to comply with the terms of the CBA, pay all additional moneys owed, and prohibiting Defendants from incurring further delinquencies. To obtain a permanent injunction, Plaintiffs must demonstrate irreparable harm and the absence of an adequate remedies at law. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir.1999) (citing *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989)). Plaintiffs' memorandum of law did not address their request for a permanent injunction. Accordingly, Plaintiffs have not demonstrated either irreparable harm or the absence of an adequate remedy at law and, thus, the Court declines to enter a permanent injunction.

## IV. Conclusion

Plaintiffs' motion for summary judgment is GRANTED. Defendants are ORDERED to pay $154,716.19 in delinquent contributions and deductions; $49,089.74 in interest; and $46,851.45 in liquidated damages for the period of May 3, 1996 to March 31, 1998. It is further ORDERED that Defendants pay $26,907.30 in attorneys' fees and costs. It is further ORDERED that Defendants pay an amount to be determined after a payroll audit for delinquent contributions, deductions, interest, and liquidated damages outstanding for the period of April 1, 1998 to May 1, 1999. The Court DENIES Plaintiffs' request for a permanent injunction.

**IT IS SO ORDERED.**

11. This calculation reflects:

1.35 Attorney hours @ $153.00 per hour = $206.55 (1996)
2.15 Paralegal hours @ $50.00 per hour = $107.50 (1996)

11.05 Attorney hours @ $158.00 per hour = $1,745.90 (1997)
33.00 Paralegal hours @ $50.00 per hour = $1,650.00 (1997)

55.05 Attorney hours @ $161.00 per hour = $8,863.05 (1998)
26.75 Attorney hours @ $125.00 per hour = $3,343.75 (1998)
47.05 Paralegal hours @ $50.00 per hour = $2,352.50 (1998)
18.60 Attorney hours @ $163.00 per hour = $3,031.80 (1999)
44.85 Attorney hours @ $125.00 per hour = $5,606.25 (1999)